PHILIPPINE SUGAR CENTRALS AGENCY et al. v. KOKUSAI KISEN KABUSHIKI KAISHA.

COMPANIA GENERAL DE TABACOS DE FILIPINAS v. SAME.

Nos. 349, 350.

Circuit Court of Appeals, Second Circuit.

July 26, 1939.

Hill, Rivkins & Middleton, of New York City (Robert E. Hill and Eugene P. McCue, both of New York City, of counsel), for appellants.

Crawford & Sprague, of New York City (George C. Sprague, Roy W. Chamberlain, and Nicholas J. Healy, III, all of New York City, of counsel), for appellee.

Before L. HAND, CHASE, and PATTERSON, Circuit Judges.

L. HAND, Circuit Judge.

These are appeals from decrees in the admiralty dismissing libels for cargo damage. The libellants are the owners of certain parcels of sugar which were shipped on October, 1933, in the Philippine Islands on the respondent's vessel, "Naples Maru", bound for Philadelphia and Brooklyn. The sugar was in about 122,000 bags, distributed throughout the ship's cargospaces; and on the outturn at Philadelphia and Brooklyn about 11,500 bags were found to have been injured. This injury was of three kinds: salt water, fresh water and molasses stains. Most of the salt water damage was in holds one and two: in hold one it included sugar in both of the two 'tween decks and in the lower hold; in hold two, only in the two 'tween decks. A little damage was found in the 'tween decks of hold four. The sweat damage was on the wings, and on the top tiers in all holds and 'tween decks. The bags in the bottom tiers of all lower holds and 'tween decks were molasses stained, but this was worse in the holds than in the 'tween decks. Throughout the stow were scattered at random bags stained with molasses, surrounded by unstained bags. The ship justified under an exception for perils of the sea, contained in the bills of lading. She alleged that she had encountered extremely heavy weather in the Pacific between November 28th and December 2d, during which it was impossible to ventilate the cargo, although the storm was accompanied by a severe drop in temperature; and that while it was raging, the tarpaulins covering hatches one and two were either torn or got loose; and that the iron hatch combings were broken, admitting sea water. As for the "molasses damage" throughout the stow, she relied upon the inherent vice of the sugar itself. Finally, she asserted that the libellants had not proved the condition of the cargo when delivered.

As to the sea water damage, the libellants answered that the tarpaulins were old and unsound, and would not have withstood a storm of ordinary violence for the season. As to the sweat, they said that the cargo had not been properly ventilated at any time between Manila and Philadelphia, not only because the ship had an improper ventilating system, but also because the cowls had been stowed in the 'tween decks, and had never been shipped on the voyage. They further alleged that the ship was loaded below her marks which made her more readily take seas aboard during heavy weather. They said that the damage to the bottom tiers in the 'tween decks was due to the clogging of the scuppers, which had not been properly cleaned when the ship broke ground; and they attributed the damage to the bottom tiers in the hold to the accumulation of sweat and salt water in the bilges, which swashed up against the bags with the movement of the ship.

First, as to the salt water damage. We are satisfied that the storm which the ship met between November 28th and December 2d was a "peril of the sea" within the meaning of the bill of lading. By the evening of the 28th it was blowing from the northeast with a force of nine on the Beaufort scale, and this kept up until the next morning, when it increased to ten. The wind continued at this velocity until the evening of the 30th, when for a few hours it went back to nine, but by midnight it again reached ten, after which, however, the weather began to moderate until by the early hours of December 2d it had fallen to four. Thus for a period of over three days it was blowing at between fifty and sixty miles an hour—between a "strong" and a "whole" gale. The ship was blown about 160 miles south of her course, and three times had to get back on the original great circle, which apparently she did; her normal run of about 230 miles a day was cut to eighty, sixty and forty-four. One life-boat was crushed, and a good deal of the steel superstructure was twisted, broken or carried away. We need not resort to the somewhat rhetorical description of this storm by the officers to believe that it was one of unusual severity. True, it was no more than was to be expected in those waters at that time; but in some waters at some seasons, even hurricanes are not infrequent. Although this was not a hurricane, it was bad enough to damage the gear and superstructure of a seaworthy ship. The phrase, "perils of the sea", has at times been treated as though its meaning were esoteric: Judge Hough's vivid language in The Rosalia, 2 Cir., 264 F. 285, 288, has perhaps given currency to the notion. That meant nothing more, however, than that the weather encountered must be too much for a well-found vessel to withstand. Duche v. Brocklebank, 2 Cir., 40 F.2d 418. The standard of seaworthiness, like so

many other legal standards, must always be uncertain, for the law cannot fix in advance those precautions in hull and gear which will be necessary to meet the manifold dangers of the sea. That Judge Hough meant no more than this in The Rosalia, supra, is shown by his reference to the definition in The Warren Adams, 2 Cir., 74 F. 413, 415, as the equivalent of what he said. That definition was as follows: "That term may be defined as denoting 'all marine casualties resulting from the violent action of the elements, as distinguished from their natural, silent influence.'" It would be too much to hope that The Rosalia, supra, will not continue to be cited for more than this, but it would be gratifying if it were not.

■■ The libellants say, however, that the ship was not well-found, particularly as to the tarpaulins on hatches one and two. There were four on each—an American tarpaulin being put on the outside to act as a protection, or "chafer". The testimony as to the quality and condition of these was in conflict, as in the case of nearly all the issues; but the judge heard all of the witnesses except the officers and crew, and found that the tarpaulins were fit and sound. There is certainly no such overriding balance of proof against this finding as would justify our reversing it. The fact that one of the American tarpaulins tore does not mean that it was rotten or outworn; the force of the seas may well have been such as to make any tarpaulin yield. To meet this the libellants rely upon the testimony of one of the ship's own witnesses, Narbeth, as to a declaration made to him by the chief officer, soon after the ship docked at Philadelphia. It was known at that time that the cargo might be damaged (the ship had by cable reported that possibility before reaching port) and in explanation the officer said that after the weather had moderated enough on December 2d, the master had sent forward some of the crew to repair the damage to the tarpaulins, which it had been impossible to do before, because she had been shipping seas all the time. While they were at work with the tarpaulins off, she took aboard another sea which went through the hatches. Narbeth first said that this applied to both hatches, but later confined it to hatch one. We find it difficult to understand why the libellants should suppose that this proved the ship's negligence. It was proper to repair the damage

to the hatch coverings as soon as possible, for the weather might at any moment get bad again. Certainly it was for the master to decide when it first became safe for the crew to work forward, and whether the risk that the ship might take seas on board while the repairs were going on, was less than the risk of leaving the cargo any longer unprotected. It is quite true that none of the officers in their testimony mentioned the occurrence, and perhaps they suppressed it because they thought it damaging. However that may serve to discredit them generally, it does not help to establish their negligence: either the water entered in that way, or it did not; if it did, the ship has not been shown to have been at fault.

■ Finally, the libellants upon this branch of the case—and the point is also relevant to the sweat damage—assert that the ship was overloaded. Their calculations are based upon her draught at Iloilo and Manila, and upon the assumptions that she was then riding in water of full salinity and that her coëfficient of submersion was constant. The first is doubtful, and the second is untrue. Both ports are at the mouths of rivers and nobody knows how saline the water may have been. The submersion schedule, Ex. 2, shows that the coëfficient varied as the stern and bow were put down more and more; and that is indeed obvious. After allowance is made for the coal and water consumed, the ship must have been above her Plimsoll marks on November 28th, even if her draught at Iloilo and Manila was taken in water of full salinity. We therefore excuse the ship for the sea water damage.

■ Next as to the sweat damage. The critical issue here is whether the vessel shipped her cowl ventilators during any part of the voyage. Assuming that she had them accessible, we can find no excuse during much of her voyage to Los Angeles for not using them, as concededly she did not. Obviously the ventilation was much less through the stumps of the ventilators than it would have been through cowls trimmed to the wind. The only excuse for not shipping them is that the weather was always threatening, and that even if the master's judgment was wrong the error was one of "management" under section 3 of the Harter Act, 46 U.S.C.A. § 192, and not of the "care and custody" of the cargo. There really was no excuse for never using the cowls on the Pacific, if

they were in fact as accessible as the officers swore. There were a number of days when no master could be justified in supposing it dangerous to ship them; if they were really at hand, there could have been no reason for not doing so except the labor involved. It is true that sugar, unlike fruit for example, is not a preëminently perishable cargo, but still it is hygroscopic and changes in temperature will make it sweat. This cargo was entitled to as much circulation of air in the holds as could have been obtained by so simple an expedient. Plainly the fault concerned, not the "management" of the ship, but "the care and custody" of the cargo. Andean Trading Co. v. Pacific Steam Navigation Co., 2 Cir., 263 F. 559; Barr v. International Mercantile Marine Co., 2 Cir., 29 F.2d 26. Cf. The Germanic, 196 U.S. 589, 25 S.Ct. 317, 49 L.Ed. 610. Under the doctrine of The Vallescura, 293 U.S. 296, 55 S.Ct. 194, 79 L.Ed. 373, this omission was enough to cast the ship for all sweat damage, for it would be impossible to disentangle the damage done during the storm from that done before and after it. But the fault goes deeper, if the cowls were in fact not accessible at all, and therefore, not used on any part of the voyage. Upon this issue the testimony is in hopeless conflict. When the depositions of the crew were taken in New York immediately after the conclusion of the voyage, the ship's boatswain swore that the cowls were all stowed away in number four upper 'tween deck; and explained that if they had not been, they might have been damaged in heavy weather, and would then have let in sea water. This testimony was taken after the chief officer had been examined, but he was recalled about eighteen months later, and then testified that the cowls stowed in number four 'tween deck were four or five spares; that the ten regular ventilators had always been shipped whenever the weather permitted; and that when it did not, they had been stowed on the poop deck, the lower bridge and boat deck. There is nothing in the record to confirm or contradict him in this. The uniform entry in the log, on both the first and second legs of the voyage, was, "opened all hatches and ventilators for ventilation." Before Los Angeles this could have meant no more than taking out the plugs from the stumps; presumably it meant the same afterwards; but it is only fair to say that, if the cowls had actually been shipped, the log might not have recorded it. The testimony of the surveyors is in even more startling and irreconcilable disagreement as to whether any cowls were in position when the ship reached Philadelphia and Brooklyn. Narbeth said that he found all but one shipped at Philadelphia; so did Scott at Brooklyn. Meinel at Philadelphia, and Vaughan and Bagger at Brooklyn, found none shipped, but six stowed in the upper 'tween decks of number two and number four. Upon this testimony we should have accepted any finding, but the judge did not make one, and we are thrown back upon the printed record. In such an even balance of evidence, if forced to decide, we should take the boatswain's testimony as determinative, but we do not think that we need decide at all. The burden of proof was on the ship to bring the sweat damage within the exception; if she undertook to show, as she did, that it was the weather which prevented her from ventilating the cargo, obviously that presupposed proper equipment.

Last as to the "molasses damage". Any bags coming from the middle of the stow are too obviously on the libellants' account to require discussion. The stained bags found elsewhere were on the bottom tiers of either the 'tween decks or the holds. As to the 'tween decks the ship's liability depends upon whether the scuppers were free when she broke ground, for if they were, they became clogged by lint from the bags and syrup from the sugar. Again the testimony is in great conflict, but this time we have a finding of the judge that the scuppers had been cleaned before the ship left Manila, and that the clogging was due to "syrupy water". We will not disturb this finding and we put this damage upon the libellants' account. There remains the "molasses damage" to the bottom tiers in the holds. This could have come from the "migration of moisture" through the sugar by gravity; and so much of it as was found at the turn of the bilges could also have come from the swashing of bilge water, both sweat and sea water. Scott acknowledged that the damage there might be from that cause, and most of it must have been. How much of the water in the bilges was from sweat, and how much was sea water, it is impossible to say, just as it is impossible to say how much of the damage was caused by any kind of water, and how much was due to the "migration

of moisture"; but since some of it was certainly due to sweat, that will charge the ship with all, unless she can segregate the several contributions, which she cannot. The damage to the bottom tiers away from the turn of the bilges cannot be so explained. Water would indeed run along the tops of the tanks, but it would be kept from reaching the sugar by the dunnage which was at least three or four inches thick. The libellants' theory is that, since the dunnage was constantly wet, the bags must have absorbed some of this moisture and that this accounted for the stains. All things are possible, but this seems to us unlikely; it is far more reasonable to suppose that this damage was due to the "inherent vice" of the sugar itself. This was the conclusion we came to in Warner Barnes & Co. v. Kokosai Kisen Kabushiki Kaisha, 2 Cir., 102 F.2d 450, upon facts very similar to those in this record.

The libellants made a prima facie case for delivery in sound condition, just as the libellants did in Warner Barnes & Co. v. Kokosai Kisen Kabushiki Kaisha, supra. We are to assume that the bags showed no stains when the ship received them, and we know that the damage at the outturn was less than ten percent, and, except at the bottom tiers in the holds, was caused by water, fresh or salt. This forms a just basis for inference that the sugar was fit for transportation, except insofar as it was liable to "migration of moisture". There is no reason for supposing that the damage on the tops and sides of the stow was from that.

In conclusion we wish to say a word about the logs. Encouraged perhaps by the successful attack upon the logs by the libellants in Warner Barnes & Co. v. Kokosai Kisen Kabushiki Kaisha, supra, the libellants at bar have not hesitated to assert that these too were forged. That in spots they had been erased and written over is quite true, but we can find no justification for impugning their honesty; and unsupported charges recoil upon those who make them. The Japanese are probably the only people in the world who keep their logs in a foreign language, and they would be more apt for that reason to make mistakes in them. We do not of course mean that that practice of erasures is proper in a log; but its impropriety is far from justifying defamation of these seamen, who, so far as appears, are very much like others of their craft.

The libellants will take decrees for all sweat damage, and for "molasses damage" at the turn of the bilges in all lower holds; in other respects the libels will be dismissed.

Decrees modified.