HECHT, LEVIS & KAHN, Inc., Libellant,
v.
ISTHMIAN STEAMSHIP COMPANY, Respondent.

United States District Court
S. D. New York.
March 8, 1957.

Bigham, Englar, Jones & Houston, New York City, for libellant, Owen C. Torrey, Jr., New York City, of counsel.

Kirlin, Campbell & Keating, New York City, for respondent, E. J. Heine, Jr., L. de Grove Potter, New York City, of counsel.

SUGARMAN, District Judge.

Hecht, Levis & Kahn, Inc., sues the Isthmian Steamship Company for damage to a cargo of rubber carried on the S. S. Steel Recorder.

At the opening of trial, the Rubber Corporation of America was substituted as party libellant, and Isthmian Lines, Inc., was substituted as party respondent. The pleadings are amended accordingly.

The cargo here involved is a shipment of 500 tons of No. 1 ribbed smoked sheet rubber. It comprised 20 lots, each of 224 bales. One lot was accepted by the consignee despite trifling damage; the suit concerns the remaining 19 lots.

The rubber was purchased by Hecht, Levis & Kahn, Inc., from Anglo French & Bendixsens Ltd., Singapore. Payment was made by sight drafts on Hecht, Levis & Kahn, Ltd., London, for 70,666.-92 pounds sterling, which was paid prior to the arrival of the goods at New York and after the consignee had received the bills of lading.

Hecht, Levis & Kahn, Ltd., was the parent corporation of both Hecht, Levis & Kahn, Inc., and Anglo French & Bendixsens Ltd. However, each of the three corporations involved in the transactions was managed by its own officers independently of the others and all of their dealings, in so far as the issues of this suit are affected, were at arm's length.

One lot of 224 bales of rubber was loaded at Singapore on February 15, 1954. Nineteen lots were loaded at Port Swettenham on February 17 and 18, 1954. The S. S. "Steel Recorder," after visiting several other ports of call, departed for the United States and arrived in New York on May 4, 1954. The vessel's itinerary had been altered en route to include loading of cargo at Calcutta which extended the length of the voyage. The lot loaded at Singapore was moved at Calcutta to make room for other cargo. No claim, however, is made that the prolonged voyage was related to the damaged condition of libellant's rubber. When the rubber was unloaded, nineteen lots were found to be damaged by contact with fresh water.

The bales were made up of sheets of rubber imprinted with a diamond or wobble pattern, each sheet being approximately $\frac{1}{4}''$ thick, 19'' wide and 60'' long in extended state, but folded over to a length of approximately 24'' for shipment. In making up the bales, stacks of these folded sheets were enveloped in sheets of the same rubber. The package was sealed by lapping and folding the ends of the wrappers and punching them in with a heated iron or by applying latex sealer. The dimensions of a bale was approximately 19'' x 19'' x 24''. The exterior was given a coating of talc or talc and tapioca flour compound which was brushed on in a wet state and dried quite promptly. The purpose of this coating was to prevent the bales from adhering together while in stow. The shipping marks were finally stencilled over this coating.

The bills of lading under which the cargo in suit was carried and on which the consignee relied in making payment are clean of exceptions and recite that the rubber was in apparent good order and condition when taken aboard.

■ The damage was caused by fresh water entering the bales at the folds in the wrapper sheets, resulting in deterioration inside at the edges of the sheets and in the wrapper sheets. I find that the water was not in the bales at the time that they were wrapped and that the wetting occurred after the bales were made up. The problem is—when?

The libellant produced no evidence on its direct case, of the condition of the

goods when they were accepted for carriage on the S. S. Steel Recorder. It relied solely on the recital in the bills of lading that the bales of rubber were in apparent external good order and condition.[1]

■ But a libellant sustains his burden by solely relying on the clean bill of lading only when the condition of the goods on outturn is utterly inconsistent with the represented apparent good condition at the time of lading.[2]

■ Where the bad condition on outturn is consistent with apparent good order and condition on lading, the libellant's prima facie case must contain proof of either (a) bad order and condition on lading, (b) good internal condition on lading or (c) negligence in stowing or carriage.

For obvious reasons the respondent forbore moving for dismissal at the end of libellant's direct case.[3] It proved [4] that the cargo was loaded in the manner customarily employed at Singapore and at Port Swettenham. At the time the goods were received aboard the S. S. Steel Recorder, the inspection given by the ship's officers, which was reasonable under all the circumstances, revealed that the cargo was in fact in apparent good order and condition. The holds were properly ventilated during the voyage. At no time was sweat present in the cargo compartments. No sanitary or fresh water lines running through the holds were faulty in any manner, nor could rain have been the cause of the wetting of the libellant's rubber. Precautions were observed to prevent this source of moisture from contaminating the cargo. The evidence militates against the probability of rain, descending through the hatches, being the source of the water found in this rubber.

The rubber stowed in No. 4 shelter deck turned out sound except for bales in "the middle of the pile," according to the third mate of the S. S. Steel Recorder. Respondent's expert witness, who surveyed the cargo in suit when the stow was broken in New York and who was in attendance during the discharge of this rubber, found no distinct pattern of damage through the stow. On the contrary he found that the irregular position of the damaged bales in the stow was consistent with a pre-loading wetting and inconsistent with water coming in contact with the rubber from any source aboard the vessel, other than seepage from within the bales, i. e., a vice inherent in the cargo itself.

■ When libellant found itself confronted with respondent's proof of absence of negligence and of proper carriage and stowage, the former sought to repair its proof in rebuttal. It offered testimony by its surveyor that the damage found in the cargo in suit did not result from water which was present at the time of shipment. His opinion was based on an alleged difference between the type of stain which results from a wetting while in stowage and the type of stain resulting from a pre-shipment wetting. The difference between the types of staining was not stated. However, considering the background and qualifications of the witness, the vague-

1. The theory of libellant's direct case was stated by counsel to be—"We expect to prove the ownership of the rubber, the fact that it was in apparent good condition when shipped, the fact that it was in apparent bad condition when it was outturned, and we will thereby impose on the respondent the burden of explaining and excusing, if it can, the loss."

2. The Carso, 2 Cir., 53 F.2d 374, certiorari denied Navigazione Libera Triestina v. Molinelli, Giannusa & Rao, Inc., 284 U.S. 679, 52 S.Ct. 140, 76 L.Ed. 574.

3. 4 Benedict on Admiralty 61, note 17.

4. The theory of respondent's direct case was stated by counsel to be—"We intend to show first of all that the damage or the alleged damage and the alleged staining, whatever you may call it, did not occur on the ship; that it may have been due to factors existing at the time of shipment. We intend to show this by showing the type of stowage we gave and the manner of caring for the cargo while it was in our custody."

ness of this testimony, the fact that he did not examine the cargo in stow and his own earlier testimony that he could not tell from his inspection when the cargo had become wet, except that it was at some time after the bales were made up and at least 24 hours prior to his inspection, this testimony of libellant's expert was more guess than opinion. It is insufficient to persuade me that the cargo was not inherently defective despite its apparent good order and condition when tendered to the carrier.

Rejection of the witness' conclusion is further justified by the respondent's aforementioned showing of proper loading and stowage and its negation of any probable onboard source of the fresh water which damaged the goods.

The condition of the goods at outturn was thus not utterly inconsistent with their apparent external good order and condition when laden. On the evidence in the entire case the libellant failed to prove that the rubber in suit was in good order and condition when delivered to the respondent for carriage,[5] or that respondent was negligent in stowage or carriage. The inference is inescapable that the cargo was in fact affected with a concealed defect or inherent vice, namely, fresh water within the bales, when respondent took the rubber aboard. This defect was not known to it, not being so obvious as to give respondent constructive notice thereof upon the ship's officers having given the goods a reasonable inspection. The cargo was properly transported and the libellant has sustained no loss for which this respondent must make good.

This decision which is the court's final determination[6] may serve as the findings of fact and conclusions of law unless either party desires more formal findings and conclusions.

Settle an appropriate decree dismissing the libel.

5. Hecht, Levis & Kahn, Inc. v. The S. S. President Buchanan, 2 Cir., 1956, 236 F.2d 627, 631; Kupfermann v. United States, 2 Cir., 1955, 227 F.2d 348, 350.

6. Cf. F. & M. Schaefer Brewing Co. v. United States, 2 Cir., 1956, 236 F.2d 889; Matteson v. United States, 2 Cir., 240 F.2d 517.