**F. BADRENA E. HIJO, INC.,**

v.

**THE Steamship RIO IGUAZU, Her Engines, Boilers, Tackle, etc., and Her Owner, Flota Mercante del Estado**

and

**The United States of America (War Shipping Administration), Universal Navigation Corporation and Waterman Steamship Corporation.**

No. 973.

United States District Court
E. D. Louisiana,
New Orleans Division.

Jan. 18, 1960.

Deutsch, Kerrigan & Stiles, Malcolm W. Monroe, Robert B. Deane, New Orleans, La., proctors for libelant.

Chaffe, McCall, Phillips, Burke & Hopkins, Leon Sarpy, Donald A. Lindquist, New Orleans, La., proctors for Flota Mercante del Estado.

Phelps, Dunbar, Marks, Claverie & Sims, J. Barbee Winston, New Orleans, La., proctors for Waterman SS Corp.

M. Hepburn Many, U. S. Atty., Kathleen Ruddell, Asst. U. S. Atty., New Orleans, La., for the United States.

CHRISTENBERRY, Chief Judge.

This is an action for damage to a shipment of 524 bales of jerked beef carried

from Buenos Aires, Argentina, to New Orleans, Louisiana, on the Steamship Rio Iguazu, and subsequently carried from New Orleans, Louisiana, to San Juan, Puerto Rico, on the Steamship Unaco, in the year 1944. The Rio Iguazu was owned and operated by Flota Mercante del Estado, hereinafter referred to as Flota, and the SS Unaco was owned by Universal Navigation Corporation, and under time charter to the United States of America. Waterman Steamship Corporation, hereinafter referred to as Waterman, acted as agent for the United States of America.

On discharge from the SS Unaco in San Juan, the shipment was found to be damaged. The nature of the damage was sourness, as a result of which the jerked beef was unfit for human consumption. An action was filed in this Court in September, 1945, by F. Badrena e Hijo, Inc., in the amount of $15,000 against the Rio Iguazu and Flota Mercante del Estado, and the United States of America (War Shipping Administration), Universal Navigation Corporation, and Waterman Steamship Corporation.

This cause having come on for trial, on the pleadings and the evidence of respective parties, and due deliberation having been had, the Court now makes the following findings of fact and conclusions of law:

Findings of Fact

1.

On August 21, 1944, respondent Flota received on board the Steamship Rio Iguazu, 524 bales of jerked beef, and in return therefor issued its bill of lading under which the beef was to be carried from Buenos Aires, Argentina, to New Orleans, "in transit to San Juan, Puerto Rico". The bill of lading provided for delivery to the order of Royal Bank of Canada, "notify Waterman Steamship Corporation". It contained no exceptions, and acknowledged receipt of the consignment in apparent good order and condition.[1]

2.

The Rio Iguazu sailed from Buenos Aires for New Orleans on or about August 22, 1944, and arrived at New Orleans on or about September 22, 1944. The shipment was stowed in the No. 1 hold of the Rio Iguazu in the square of the hatch, together with 265 other bales of jerked beef on top of bales of wool and hides.

3.

Subsequent to issuance of said bill of lading by Flota, and prior to arrival of the Steamship Rio Iguazu in New Orleans, libelant paid $17,812.01 for the original negotiable Flota bill of lading, which document was evidence of ownership of the consignment described therein. On September 13, 1944, libelant delivered the Flota bill of lading to Waterman Steamship Corporation in order that Waterman could obtain delivery of the consignment at New Orleans. Waterman thereafter delivered said bill to Flota's agent at New Orleans in return for delivery of the consignment.

4.

Upon arrival of the Rio Iguazu in New Orleans, James A. Laing, Marine Surveyor, acting for Flota, boarded the Rio Iguazu and made a survey of her cargo aboard the vessel, and also subsequently on the wharf after discharge. Laing's survey was not made because of known or suspected damage, but such a survey was standard operating procedure of Flota. Laing visually inspected the exterior of the bales of jerked beef, and found them damp and discolored by contents and stained with grease from contents. However, Laing considered this the usual condition and appearance of jerked beef, based on his prior experience, and was of the opinion that the shipment was in apparent good order and condition. Laing did not inspect and does not know the actual condition of the interior of any of the bales of beef, and could not have done so without breaking the covering.

1. Flota bill of lading No. 123; exhibit "Flota 1".

**5.**

There is no evidence that at the time of discharge from the Rio Iguazu the shipment was in a damaged condition.

**6.**

After discharge from the Rio Iguazu, the shipment was delivered on September 25, 1944, by Strachan Shipping Company, agent for Flota, to W. L. Richeson & Sons, Inc., for the purpose of moving the shipment from the wharf of Strachan Shipping Company to the wharf of Waterman. Waterman, acting as agent for libelant, had engaged W. L. Richeson & Sons, Inc., but at the expense of libelant, to receive the goods and to transfer them from Strachan's wharf to that of Waterman.[2] Delivery receipts obtained by Strachan Shipping Company to W. L. Richeson & Sons, Inc., show "all bags stained".

**7.**

W. L. Richeson & Sons, Inc., took possession of the shipment and delivered it to Waterman on September 26, 1944. On the delivery receipt obtained by W. L. Richeson & Sons, Inc. and the dock receipts issued by Waterman, the only exception noted was "1 bale T/R Gross Wgt 42#". Waterman's bill of lading, which was issued on September 27, 1944, was straight and non-negotiable. It contained only the one exception "1 bale T/R Gross Wgt 42#".

**8.**

Staining, discoloration, and greasiness of the bales of beef is the usual appearance of the bales of jerked beef, and do not indicate damage to the contents of the bales. Such conditions occur in part at least as a result of the contents of the bales exuding through the containers. Libelant became the owner of the shipment prior to issuance of Waterman's bill of lading, which was straight and non-negotiable, and libelant does not contend that the omission from Waterman's bill of lading with respect to the exterior of the bales has prejudiced or damaged libelant in any way.

**9.**

(a) After delivery of the shipment to Waterman on September 26, 1944, said shipment was loaded aboard the SS Unaco in the No. 1 lower hold, and the SS Unaco sailed for San Juan, Puerto Rico, via Mobile, on September 27, 1944.

(b) It had rained on September 25th, and, because the stevedores had left the Unaco's hatches, including No. 1, uncovered, rain entered the No. 1 hold for a period of about 10 minutes.

**10.**

Libelant did not obtain the inspection of the interior of any of the bales of beef after discharge from the Rio Iguazu and prior to delivery to Waterman in New Orleans, and libelant admittedly does not know the actual condition of the shipment at the time of delivery to Waterman.

**11.**

The Unaco was a dry cargo vessel built in 1918, with engines amidship. She had a raised forecastle and a raised poop. There were bulwarks about 4 feet in height between the after end of the forecastle and amidship accommodations.

**12.**

There were four ventilators to each hold of the four holds of the vessel. There was a single wooden 'tweendeck in each hold, and the two forward ventilators went into the lower hold and the two after ones to the 'tweendeck. These ventilators were of the cowl type and each set of two ventilators was in a line athwart the vessel, about 5 feet outboard of the keel line.

**13.**

The holds of the Unaco were ventilated by trimming the weather vents away from the wind and the lee vents into the wind to circulate air through the holds. If there was rain or a heavy sea running or if the weather was cloudy and damp, the vents were backed to the wind. According to the log of the Unaco, wind velocity on the voyage from New Orleans

to San Juan at no time exceeded force 5 on the Beaufort scale which is approximately 17 to 21 knots.

### 14.

The shipment of jerked beef was stowed in the after end of the No. 1 lower hold of the Unaco. Stowed also in this hold were lumber, bags of animal feed and other general dry cargo. There is no source of heat in said hold and there was testimony that the No. 1 lower hold is one of the coolest stowage spaces in the vessel. The beef was situated on top of a shipment of lumber, approximately 11 to 12 feet from the bottom of the hold, athwart the vessel, beneath the coaming in the after end of the hold. There was no cargo stowed on top of the beef. There was a floor of dunnage under the beef, and there were permanent sweat battens at the sides of the vessel and at the after bulkhead of the No. 1 lower hold. The place and manner of stowage permitted the cargo to be ventilated.

### 15.

The Unaco sailed from New Orleans, Louisiana, on September 27, 1944, for Mobile, Alabama, arriving on September 28. The Unaco departed Mobile on October 4, 1944, for San Juan, and arrived there on October 13, 1944.

### 16.

Discharge operations were carried on until October 20, 1944. The date of discharge of the beef was probably October 19, 1944.

### 17.

After discharge of the shipment from the Unaco and while on the wharf, an inspection was made by Dr. Lowell R. Barnes, Assistant to the Inspector in Charge, and Mr. James O. Fly, Inspector, Bureau of Animal Industry, Department of Agriculture of the United States at San Juan. The shipment was also inspected and observed subsequently by Dr. Barnes and Mr. Fly at the Customs Warehouse in San Juan where it was taken for reconditioning. Dr. Barnes and Mr. Fly, whose testimony was taken by the Unaco interests, found portions of the shipment were sour and unfit for human consumption.

### 18.

Dr. Barnes and Mr. Fly testified that there were no indications from the external or apparent condition of the bales of beef that there was any damage. The cause of damage was sourness, which was detected by cutting the meat and then smelling it. The sourness was internal or inside the pieces of meat. It was found more in the thicker portions of the meat, and was not related to where the strips were folded nor to the location the piece of meat occupied within the bale. Approximately 43,580 pounds of beef were in good condition out of a total weight of approximately 88,821 pounds.

### 19.

Libelant sought to introduce in evidence a letter written by the Collector of Customs in San Juan to libelant dated June 13, 1945, stating that the customs records showed the bales were wet with water when brought into the Customs Warehouse upon discharge from the Unaco. The Unaco interests objected to the admissibility of said letter, and I do not think that the letter should be admitted. In any event, I do not think that the letter should be accorded much weight or value.[3]

The surveyor for insurers of the shipment, Benjamin Acosta of Dargan & Co., Inc., of San Juan, saw the shipment at the Customs Warehouse on October 21,

---

3. The records of the Collector of Customs had been destroyed because of the passage of time, were not introduced in evidence, and the actual contents thereof are unknown. The letter is in effect a statement by the writer of said letter as to what the records contained; the identity of the person or persons making said records and the basis for the knowl-
edge of said person or persons is not known. This seems to me to be important here, particularly in view of the greasy condition of the outside of the bales of beef, and the likelihood that this condition could have been mistaken for wetness with water. See New York Life Ins. Co. v. Taylor, 1944, 79 U.S.App. D.C. 66, 147 F.2d 297.

1944, and the report of his survey of that date states in part that "we have no knowledge of direct contact with water or any other liquid substance". Also, Acosta in a "supplemental" report dated June 14, 1945, stated that most of the bales had been noticed to be "greasy".

While there were indications that some rain got into the hold in which the beef was stowed, the evidence does not support a finding that this shipment was actually rained on, or was damaged as a result thereof. The appearance and condition of the packaging or containers of the bales on discharge, and the location and site of the damage to the shipment, lead to the conclusion that the shipment was not wetted.

I find that a preponderance of the evidence shows that upon discharge in San Juan from the Unaco, the exterior of the bales of jerked beef were greasy, and stained or discolored. This is a normal condition and the usual appearance of jerked beef, and does not indicate damage to the interior of the bales. There was nothing about the appearance of the bales to indicate damage to the contents, or which was inconsistent with the statement of apparent good order and condition in the bill of lading.

20.

The bales of jerked beef comprising this shipment weighed approximately 200 to 300 pounds each, and each bale contained a minimum of about 2 pieces of beef, and some bales more, depending on the size of the pieces. The pieces of meat were part lean and part fat, were described as being "considerably larger" than 2½′ by 5′, and varied in thickness, ranging from about 2½″ to 5″. The pieces were folded a number of times to accommodate them within a bale. Each bale was enclosed first in a cotton stockingette container, and then in a heavy cotton bag resembling burlap or canvas. The bag was enclosed by sewing.

21.

The term "jerked" signifies a product prepared by salting and airdrying. However, there is no evidence showing the actual curing or processing of this particular shipment, or the nature and type of curing or processing to which beef of this kind was subjected.

22.

The only attempt by libelant to establish the actual order and condition of the shipment is with reference to delivery to Flota in Buenos Aires, and consists in attempting to introduce into evidence four documents, two of which purport to be certificates issued by a concern called Controlco S. R., Ltd., and two of which purport to be certificates of Ministry of the Nation (Argentina), Department of Cattle, Certificates of Inspection of Meats and Derivative Products. The Unaco interests objected to the admissibility of all four of said certificates, the former two insofar as they purport to state the order and condition of the bales, and I think, as I say hereinafter, that the objections are well founded. In any event, all four certificates in my opinion are entitled to little weight. The two certificates of Controlco S. R., Ltd., are each headed "certificate of checkweighing", and I think it is obvious that the sole purpose of these two certificates is to state the number and weights of the bales. As to the two certificates purportedly issued by the Ministry of the Nation, they not only do not show the date of the inspections stated in said certificates to have been held, but there is no evidence showing the regulations or standards, if any, governing said inspections, the nature of the inspections made of the beef comprising this shipment, the identity or qualifications of the persons who made the inspections, or the process followed in curing.

23.

The only other cargo damage in the No. 1 hold of the Unaco on this voyage were several bags of animal feed which had been damaged as a result of contact with a greasy substance from the jerked beef itself.

Conclusions of Law

1.

This Court has jurisdiction of the subject matter.

## 2.

■ The evidence does not definitely establish what caused the beef to sour.[4] However, the pattern established by the damage was that it was found principally in the thicker portions of the strips of the beef. The damage was not related to the places where the strips of beef were folded, nor to the location of the strips within the bales. Since the damage cannot be accounted for on the basis of external signs or changes while in the possession of Flota, damage may have been caused by a pre-existing condition not externally apparent, or by internal vice or defects. Staining, discoloration and a greasy appearance of the exterior of the bales is not unusual for jerked beef, and does not indicate damage to the contents of the bale. Accordingly, libelant must prove the actual good order and condition of the shipment on delivery to Flota. American Tobacco Co. v. The Katingo Hadjipatera, D.C.S.D.N.Y.1940, 81 F. Supp. 438, modified on other grounds 2 Cir., 1951, 194 F.2d 449; Hecht, Levis & Kahn, Inc. v. The S.S. President Buchanan, 2 Cir., 1956, 236 F.2d 627; Crispin Co. v. Lykes Bros., S.S. Co., Inc., D.C.S.D. Tex.1955, 1955 A.M.C. 2050; Fidelis Fisheries, Ltd. v. Thorden, D.C.N.Y. 1956, 142 F.Supp. 798; Hecht, Levis & Kahn, Inc. v. Isthmian S.S. Co. [The Steel Recorder], D.C.S.D.N.Y.1957, 149 F.Supp. 373, 1957 A.M.C. 735.

■ A bill of lading reciting that the goods were in apparent good order and condition is *prima facie* evidence of the external condition only and is not evidence with respect to the internal condition of the goods. The Niel Maersk, 2 Cir., 1931, 91 F.2d 932; Hecht, Levis & Kahn, Inc. v. The President Buchanan, 2 Cir., 1956, 236 F.2d 627.

## 3.

■■ Libelant has failed to establish good order and condition of the shipment on delivery to Flota. The only evidence offered by libelant in this connection were the said certificates, which I do not think are relevant[5] and, in any event, even if admissible, do not satisfy the burden of proof which is upon libelant. That approximately 43,580 pounds out of a total weight of approximately 88,821 pounds were in good condition does not, of itself, serve to prove actual good order and condition of the entire shipment on delivery to Flota.[6] Libelant has therefore failed to establish a *prima facie* case of liability against Flota.

■ Moreover, there is no proof that the shipment was damaged on delivery by Flota, which is an essential requisite to

4. Although several of libellant's witnesses, including Acosta, libellant's surveyor, Badrena and Sauerbier sought to give opinion testimony as to the cause of damage, they were not shown to be qualified to express such opinions.

5. For example, the two certificates purportedly issued by the Ministry of the Nation refer to inspections made of the meat before, during, and after slaughter, and there is, in short, nothing to show the date of said inspections other than the date of slaughter, which in one certificate is stated to be December 9 to December 14, 1943, and in the other, June 12 to June 26, 1944, while delivery to Flota was not made until August 21, 1944. See Cohen v. Holland-America Line [The Volendam], D.C.S.D.N.Y.1934, 6 F.Supp. 247; The S.S. Glasgow Maru, D.C.S.D.N.Y.1937, 19 F.Supp. 530.

6. The condition on outturn may be considered as evidence with respect to condition on delivery to a carrier, but more must be considered than just that part of the shipment outturned damaged and part in good condition. McNeeley & Price Co. v. The Exchequer, D.C.1951, 100 F.Supp. 343. Moreover, quite logically, most courts have used outturn condition as evidence in instances in which a high percentage of the cargo, approximately 90% has outturned in good condition, Philippine Sugar Centrals Agency v. Kokusai Kisen, etc., [The Naples Maru], 2 Cir., 1939, 106 F.2d 32, 1939 A.M.C. 1087; The Glasgow Maru, 2 Cir., 1939, 102 F.2d 450; General Foods Corp. v. The Troubador, D.C.1951, 98 F.Supp. 207. (An exception is Cargo Carriers v. Brown S.S. Co., D.C.W.D.N.Y.1950, 95 F.Supp. 288, 929, in which about 70% of the cargo was in good condition).

892

establish a case of *prima facie* liability. American Tobacco Co. v. The Katingo Hadjipatera, D.C.S.D.N.Y.1940, 81 F. Supp. 438, modified on other grounds 2 Cir., 1951, 194 F.2d 449; Schroeder Bros., Inc. v. The Saturnia, D.C.S.D.N.Y. 1954, 123 F.Supp. 282, affirmed 2 Cir., 1935, 226 F.2d 147.

4.

■■ Similarly, as to the Unaco, the damage cannot be accounted for on the basis of external signs or changes while the shipment was in the possession of Waterman, for it was delivered in the same apparent order and condition as when received.

Since libelant has not proved the good order and condition of the shipment on delivery to Flota, and since libelant admittedly does not know the actual order and condition of the shipment on delivery to Waterman, libelant has failed to establish a *prima facie* case of liability against the Unaco interests.

■ Even if libelant had proved good order and condition of the shipment on delivery to Flota, this would not satisfy the burden in this respect as to the Unaco and establish a *prima facie* case against the Unaco. The shipment was carried from Buenos Aires to New Orleans, and from New Orleans to San Juan, under separate bills of lading, and the lading of the Unaco provided that the Unaco is "not liable for loss or damage to the goods while not in the actual custody of the carrier". This provision is valid. The Pioneer Land, D.C.S.D.N.Y. 1955, 1957 A.M.C. 50; Hubschman & Sons v. The Black Condor, D.C.S.D.N.Y. 1955, 130 F.Supp. 320; Newport Rolling Mill Co. v. Mississippi Valley Barge Line Company, D.C.E.D.La.1943, 50 F.Supp. 623. Thus, libelant must establish the damage occurred while the shipment was in the custody of the Unaco, which libelant has not done. Libelant should not be permitted to rely on a presumption that the shipment was in actual good order and condition on delivery to the Unaco. It is to be noted that approximately 35 days elapsed from the time of delivery to Flota in Buenos Aires to the time of delivery to Waterman in New Orleans, and also that the shipment returned to the possession of libelant in New Orleans through delivery to its agents, W. L. Richeson & Sons, Inc., Cohen v. Holland-America Line, D.C.N.Y. 1932, 6 F.Supp. 247.

Accordingly, the action as to the Unaco interests, Universal Navigation Corporation, Waterman Steamship Corporation, and the United States of America (War Shipping Administration) must also be dismissed.

5.

The evidence with respect to the appearance and condition of the packaging or containers of the bales on discharge from the Unaco, and the pattern of damage, indicate that the damage was not the result of an external cause, such as contamination by other cargo, or contact by rain or sea water, or the result of any other cause for which respondents are liable.

■ Even if libelant had established a *prima facie* case, respondents have shown that they exercised due diligence to provide libelant with seaworthy vessels, and properly cared for, handled and stowed the shipment, and that damage did not occur through fault or negligence on the part of respondents.

6.

■ Since libelant has failed to establish the damage occurred while the shipment was in the custody and possession of respondents, and since it further appears that respondents have established that the cargo received proper handling, care, and stowage, the damage must have pre-existed delivery to respondents, or have been due to inherent vice or defect in the shipment, for both of which respondents are not liable. Hecht, Levis & Kahn, Inc. v. Isthmian S.S. Co. [The Steel Recorder], D.C.S.D. N.Y.1957, 149 F.Supp. 373, 1957 A.M.C. 735.

Decree will be entered accordingly.