**UDDO & TAORMINA COMPANY,**
Libelant,

v.

**LEVANT LINE** (composed of Atlantic Ocean Transportation Corporation, Stockard Steamship Corporation, and North American Terminal Corporation) and **THE** Steamship **OBERLIN VICTORY**, Respondents.

No. 3904.

United States District Court
E. D. Louisiana,
New Orleans Division.

May 25, 1961.

Deutsch, Kerrigan & Stiles, Jack G. Carinhas, Jr., New Orleans, La., for libelant.

Terriberry, Rault, Carroll, Martinez & Yancey, Andrew T. Martinez, James L. Schupp, Jr., New Orleans, La., for respondents.

J. SKELLY WRIGHT, District Judge.

This action was instituted by Uddo & Taormina Company [1] against the Steamship Oberlin Victory and the Levant Line, time charterer of the Oberlin Victory, for damage to a consignment of 105 barrels of black olives in brine shipped from Piraeus, Greece, to New Orleans in 1958.

On April 19, 1958, when the cargo was delivered aboard, the carrier issued its clean, on board, bill of lading bearing the notation "Steamer not responsible for breakage or leakage of barrels." Under the terms of the bill, the carrier agreed to deliver the described cargo to New Orleans, Louisiana, pursuant to the provisions of the United States Carriage of Goods by Sea Act of 1936, 46 U.S.C.A. §§ 1300–1315, in the same good order and condition as when received, in consideration of certain freight charges agreed to be paid.

The wooden barrels of this consignment were of the usual construction for this type of container and were made of oak staves. Each barrel was three feet in height and contained 100 pounds of black olives in brine. The barrels were not leaking when loaded aboard the vessel but, as might be expected of wet cargo of this kind, leakage was noted by the chief mate some two days after the voyage began.

Although the No. 1 and No. 2 'tween decks of the Oberlin Victory were available for stowage, the chief mate chose to stow the entire 105 barrels of olives in a center forward compartment of No. 4 'tween deck directly aft of the engine room. The barrels actually extended to within two feet of the uninsulated engine room bulkhead.

On leaving Piraeus, the vessel proceeded to Rejeka, Yugoslavia, then Naples, Leghorn and Genoa, Italy. In discharging the cargo in suit at New Orleans on May 24, 1958, the staves of eleven barrels and the head of one barrel were cracked. Appropriate notation of this damage was made on the dray receipt issued by carrier's agent when the cargo was picked up by libelant's trucks on May 28 and 29, 1958.

On inspection at libelant's warehouse in New Orleans on May 28 and 29, 1958, it was discovered that 40 of the barrels were completely dry of brine and that the olives in all of the barrels had been damaged by reason of the loss of brine. The surveyor for cargo underwriters took adequate steps to mitigate the damage by accepting libelant's salvage bid of $960,[2] which, under the circumstances, was fair and reasonable.

Proctors have spent most of their time arguing about burden of proof. Libelant maintains that receipt of the cargo by the carrier in apparent good order and condition and delivery at destination in bad condition places the burden of proof on respondents affirmatively to show that the damage was occasioned by a cause for which it has no responsibility under the Carriage of Goods by Sea Act, and that negligence did not contribute thereto.[3] Respondent maintains that the damage in suit resulted from a pre-existing condition not externally apparent and that, consequently, libelant must prove

1. Cargo underwriters have paid the loss and are suing under a loan receipt.

2. The shipment was insured for $3,077.42.

3. Citing 46 U.S.C.A. §§ 1303(2), 1304(2) (q); Orient Ins. Co. v. Flota Mercante del Estado, D.C.E.D.La., 102 F.Supp. 729, 1951 A.M.C. 1982, affirmed 5 Cir., 198 F.2d 740, 1952 A.M.C. 1836; Schroeder Bros., Inc. v. The Saturnia, 2 Cir., 226 F.2d 147, 1955 A.M.C. 1935; American Tobacco Co. v. The Katingo Hadjipatera, 2 Cir., 194 F.2d 449, 1951 A.M.C. 1933; Robinson, Ltd. v. S.S. Stromboli, Can.Exch., 1951 A.M.C. 424. See also, The Matilde Peirce, 2 Cir., 32 F.2d 688, 1929 A.M.C. 779.

actual good order and condition of the shipment on delivery to the S. S. Oberlin Victory.[4] In addition, the carrier relies on the exception in the bill of lading providing that the "Steamer [is] not responsible for breakage or leakage of barrels."[5]

It is not necessary to follow these arguments as to burden of proof or to determine whether that burden relates merely to going forward with the evidence, as distinguished from the burden of persuasion.[6] The evidence is clear from the carrier's own witness, the chief mate of the Oberlin Victory, that the barrels of olives appeared in good order on arrival on board the vessel, that the barrels were not leaky, and that all apparently had a sufficient quantity of brine. The evidence is also clear that on arrival at destination in New Orleans this shipment of olives, in addition to the physical damage noted, had lost an inordinate amount of brine and that the olives were damaged as a result of this loss. Whatever else may have contributed to this loss, it is also clear that the carriage of this cargo in the 'tween deck alongside the engine room was a contributing factor, that the heat from the engine room and the heat from the steel weather deck immediately above no doubt combined to dry out the barrels and dry up the brine.

Section 3(2)[7] of C.O.G.S.A. provides that "The carrier shall properly and carefully load, handle, stow, carry, keep, care for, and discharge the goods carried." Barrels of olives, being wet cargo, require cool stowage. Here the shipment was given possibly the hottest stowage aboard the vessel, although more acceptable stowage was available.

It may well be, of course, as the carrier suggests, that the barrels were new and consequently more likely to leak than seasoned barrels. However that may be, unquestionably the improper stowage contributed to the damage, and the carrier has made no effort to face up to the almost impossible task of apportioning that damage.[8]

Decree for libelant.

---

4. Citing The Niel Maersk, 2 Cir., 91 F.2d 932, 1937 A.M.C. 975; American Tobacco Co. v. The Katingo Hadjipatera, D.C. S.D.N.Y., 81 F.Supp. 438, 1949 A.M.C. 49, modified on other grounds 2 Cir., 194 F.2d 449, 1951 A.M.C. 1933; F. Badrena E. Hijo, Inc. v. The Rio Iguazu, D.C. E.D.La., 182 F.Supp. 885; The Chester Valley, D.C.E.D.La., 28 F.Supp. 290, affirmed 5 Cir., 110 F.2d 592.

5. Respondent concedes, of course, that this stipulation does not protect it against its own negligence. See Schnell v. The Vallescura, 293 U.S. 296, 55 S.Ct. 194, 79 L.Ed. 373.

6. See Gilmore and Black, The Law of Admiralty (1957), pp. 146–147. See also, Comment, 27 Texas L.Rev. 525 (1949).

7. 46 U.S.C.A. § 1303(2).

8. Schnell v. The Vallescura, supra. See also, Gilmore and Black, The Law of Admiralty (1957), p. 149.