**E. T. BARWICK MILLS, INC., Plaintiff,**

v.

**HELLENIC LINES LIMITED, Defendant.**

**Civ. Nos. 2424, 2442.**

United States District Court,
S. D. Georgia,
Savannah Division.

Aug. 11, 1971.

Fred S. Clark, Brannen & Clark, Savannah, Ga., Hill, Rivkins, Warburton, McGowan & Carey, New York City, for plaintiff.

George H. Chamlee, Lawton, Sipple & Chamlee, Savannah, Ga., for defendant.

## MEMORANDUM ORDER AND FINDINGS OF FACT AND CONCLUSIONS OF LAW

LAWRENCE, Chief Judge.

"(T)he rains had come! * * * The lightning came brilliant and white, flash after flash * * *. Then the first big drops were followed faster and faster, by others until the whole sky seemed to pour forth water in one enormous cataract." [1]

Monsoon season in India had arrived.

These two actions involve a claim for damage to shipments of jute backing and jute carpet loaded at Calcutta aboard three of defendant's freighters during the monsoon season in 1965. The suits which are brought under the Carriage of Goods by Sea Act involve clean bills of lading that recited:

> "Received by HELLENIC LINES LIMITED, hereinafter called the carrier, goods, or packages * * * in apparent good order and condition unless otherwise indicated herein, to be transported to the port of discharge * * *." [2]

Barwick Mills which is consignee under the bills contends that when the shipments were discharged at Savannah there was damage to the goods in an amount totalling $10,672.91.[3] The defendant carrier denies liabiltiy. It says that the damage did not arise from wetting while the cargo was in its custody and contends that the rolls were delivered to it in damaged condition at Calcutta as a result of exposure to rains.

The cases were tried before me on July 6, 1971, on deposition and oral testimony.

During the 1950's and the early 1960's there was a great increase in the demand for jute carpet backing by American manufacturers of broadloom rugs and carpets. The harbor of Calcutta teemed with freighters loading such cargoes. Savannah was the main port for discharge because of its proximity to carpet mills. Before being loaded on barges for shipside delivery the rolls are wrapped in a polyethylene cover which, in turn, is wrapped with burlap. The jute mills are located nearly twenty miles from Calcutta on the Hooghly River. When the rolls come off the line they are transported by open "dolly" to the mill docks where they are loaded on the river boats. They are then barged to the freighters in the harbor. The hatches of the river boats can be covered in about ten minutes in event of rain. T. D. Baker, Jr., who made an investigation in 1964 of loading procedures at

---

1. Louis Bromfield, *The Rains Came* (Grosset & Dunlap, N.Y., 1937), p. 15.

2. 46 U.S.C.A., Sections 1300–1315. COGSA requires that the bill of lading shall show "The apparent order and condition of the goods." Section 1303(3) (c).

3. Of the cargo carried by "Hellenic Leader" 29 out of 469 rolls were materially damaged on the "Hellenic Laurel" 15 out of 599 and on the "Hellenic Spirit" 20 out of 1100.

Calcutta, stated that he observed much confusion among the crew of four dur-ing heavy showers and stated that the rain ceased before the hatch was covered. He further noted that the hatch tarpaulins were of questionable efficiency. He was of the opinion that, if carelessly laid, they would not fully protect the rolls in a heavy rain. The rolls remain on the barges about five days before they are loaded on the freighters. Mr. Baker saw rolls wetted in stow on the barges during sudden showers while the lighters were in transit and while the cargoes were being loaded.

The respective captains of the "Hellenic Leader," "Hellenic Laurel," and "Hellenic Spirit" testified as to the weather conditions while the three vessels took on cargo at Calcutta. Captain Nicholas Georgakopoulas said that the "Hellenic Leader" was loaded with a cargo of jute backing brought alongside in steel barges from June 17th to July 2, 1965. The log of the ship shows that rain caused a cessation of loading one or two or more times every day except one during that period. Captain George Koutroulias of the "Hellenic Laurel" testified that, according to the log, it rained every day from July 5th to July 14, 1965, at which latter date loading was completed.[4] The "Hellenic Spirit" arrived at Calcutta on August 13th and discharged cargo until August 19th. Cargo was loaded beginning August 20th. According to Captain Samaras, there was rain every day but one from that day to August 28th when loading was completed.

Because of the lack of dock facilities at Calcutta cargoes are loaded from the lighters while the freighters are anchored out in the stream. Mr. Baker thus described the conditions in the harbor at this period: "Due to (beyond belief) the crowded, and admitted confused and poorly maintained port facilities, the Steamship Companies are forced, in order to avoid catastrophic delays, to ac-cept the docking instructions, facilities and work their cargo 'around the clock' regardless of the weather potential." Some of the hurly-burly, helter-skelter conditions that exist in the discharge and loading of ships in that port may have affected the surveying process. Hellenic Lines employed a well-known Calcutta firm to survey the rolls as they were placed aboard the freighters. It seems that many of the burlap wrappers were stained and were not opened in every instance for inspection of contents. Whenever they were opened, they were rejected by the surveyors if there was damage to the contents in any degree whatever. It seems to have been the practice of the jute mills to use stained burlap as wrappers. The survey reports as to loading of the three vessels reveals that nearly 300 rolls with stained covers were slit open for examination of the contents. In every such case it was noted: "Contents apparently sound." The Surveyor's report stated that, "We are satisfied that the aforenoted cargo * * * has suffered no damage except as aforenoted."

Plaintiff does not seriously challenge defendant's assertion that the jute backing was damaged by monsoon rains while aboard the lighters *prior* to delivery to the ships. Barwick Mills takes the position that the issuance of clean bills of lading by Hellenic Lines constituted *prima facie* evidence of apparent good order of the cargo and that the failure of the carrier to rebut the inference necessitates a finding in its favor. Plaintiff also contends that an estoppel exists on the part of Hellenic Lines because of the issuance of bills of lading which recited that the shipments were received in good condition despite the fact that it knew the goods were damaged when delivered. In this connection see Higgins et al. v. Anglo-Algerian S. S. Co., Limited, 2 Cir., 248 F. 386; Olivier Straw Goods Corporation v. Osaka Shosen Kaisha, 2 Cir., 27 F.2d 129.[5] I shall refer to the estoppel issue later.

4. Captain Koutroulias testified by deposition as well as in person.

5. The cases on estoppel appear in 67 A.L.R. 2d 1066.

**164**

Under maritime law, a *prima facie* case is established in favor of the shipper by a carrier's receipt of cargo in good order which is in bad condition at outturn. Compagnie De Navigation Fraissinet v. Mondial United Corporation, 5 Cir., 316 F.2d 163, 172; Otis McAllister Export Corp. v. Grancolombiana, D.C., 216 F.Supp. 756; Interstate Steel Corporation v. S. S. "Crystal Gem", D. C., 317 F.Supp. 112; Demsey & Associates, Inc. v. S. S. Sea Star, D.C., 321 F.Supp. 663. The presumption of delivery in good order is rebuttable (Horn v. Cia de Navegacion Fruco, S.A., 5 Cir., 404 F.2d 422) but the carrier has the burden of presenting sufficient proof to refute the *prima facie* evidence of good order. Kupfermann & Sons v. United States, 2 Cir., 227 F.2d 348; Interstate Steel Corporation v. S. S. "Crystal Gem", *supra*, 317 F.Supp. at 119. However, the recitation of good order in a bill of lading refers to the *external*, not to the *internal* condition of the goods. F. Badrena E. Hijo, Inc. v. Steamship Rio Iguazu, D.C., 182 F.Supp. 885, 891; J. Gerber & Co., Inc. v. Holland-Amerika Lijn, D.C., 261 F.Supp. 893; Samincorp South American Minerals & Merchandise Corporation v. S. S. Cornwall, D.C., 240 F.Supp. 327. The existence of stains on the burlap covering of rolls of jute does not necessarily mean damaged contents.

I think that the facts presented by the carrier in this case are sufficient to overcome, by a preponderance of evidence, the inference of delivery in good condition which arose from the issuance of clean bills of lading.

I recur now to the estoppel issue which plaintiff has raised. In *Higgins, supra*, there was no negligence or mistake by the carrier but there was an evident willingness on its part to assist the shipper in misleading subsequent holders of the bill of lading as a result of the agreement of the shipper to hold the carrier harmless. There is nothing of that sort in the instant case. In *Olivier Straw Goods Corporation, supra*, the cargo was "manifestly damaged" at the time the clean bill of lading was issued by the carrier. We do not have such a situation here.

I have not dealt with the possibility that damage to some of the rolls occurred following delivery to the carrier, that is, during the hoisting and stowage thereof on the freighter or in transit. Perhaps it is unnecessary to deal with this subject in the light of plaintiff's seeming concession that the rolls were damaged by monsoon rains while aboard the lighters. Nevertheless, I will comment briefly as to this aspect of the case.

When was delivery to the carrier effected? It has been held that where lighters moor alongside a vessel and the ship assumes sole control over them the cargo is to be considered as delivered and the ship is responsible for subsequent damage. Mackey v. United States, 2 Cir., 197 F.2d 241. This is not such a case. While the lighters tied up alongside the ships, the carrier had no control over them.[6] The ship's officers were never aboard the barges.[7] Stevedores handled the slings on the lighters and were in the holds of the freighters. The ship's gear was used to load the cargo. The earliest time of delivery would, in my opinion, be when the hoisting movement of the winches commenced.

Some damage by rain could have occurred after that stage. The evidence is that loading ceased on such occasions. A canvas tent was placed over the hatches or the hatches were closed. Either operation could be accomplished in about two or three minutes. The surveys at Calcutta indicate numerous cases of rolls being wetted due to sudden rains while the rolls were in the hatches. Apparently, in all of these instances the surveyors slit the canvas and found the con-

6. Captain Samaras testified that at times there would be 50 or 60 lighters next to the ship. Deposition, p. 36.

7. Deposition of Captain Georgakopoulas, p. 46.

tents to be sound. The surveyors were constantly present during the loading of the vessels. There was no rough weather during any of the voyages which would account for water damage. The holds were free of water. The hatch covers were waterproof.

█ Under the evidence and the applicable law I find that the carrier is not liable to Barwick Mills for the damage to the jute backing and jute carpets. Judgment is therefore rendered in favor of the defendant. A form of judgment may be submitted.