J. GERBER & CO., Inc.

v.

HOLLAND–AMERIKA LIJN and the S. S. AARDIJK, her engines, boilers, tackle, etc.

No. 4200.

United States District Court
E. D. Louisiana,
New Orleans Division.

Dec. 27, 1966.

James J. Morrison, New Orleans, La., for libelant.

Edward S. Bagley, Terriberry, Rault, Carroll, Yancey & Farrell, New Orleans, La., for respondent.

WEST, District Judge:

This is a maritime claim for cargo damage. Libelant, J. Gerber & Co., Inc., brings this action against respondent, Holland-Amerika Lijn, as the owner and operator of the SS AARDIJK, and against said vessel in rem, seeking to recover damages allegedly sustained when, during the voyage from Antwerp, Belgium, to Mobile, Alabama, part of a cargo of 683 coils of galvanized steel wire belonging to libelant was allegedly damaged by exposure to sea water. Libelant contends that because of exposure to sea water during the voyage, some of the wire was caused to corrode and rust. Respondents answer contending that there is no proof of any exposure of the cargo in question to sea water, and that in fact, no such exposure was encountered by the cargo during the voyage. They contend that the cargo was discharged in Mobile, Alabama in the same condition as it was received in Antwerp, Belgium, and that thus respondents are not liable to libelant for any damages whatsoever. The matter was submitted to the Court on the question of liability only on depositions and exhibits filed in the record. Upon thorough review of this record, including the depositions and exhibits filed, and after careful consideration of the briefs of counsel, the Court concludes that libelant has failed to carry the burden of proving that the cargo in question was damaged while in transit from Antwerp, Belgium to Mobile, Alabama, and that hence respondents are not liable for the alleged damage to this cargo.

The SS AARDIJK arrived in Antwerp on November 14, 1958, and loaded the cargo here in question aboard on November 15 or 16, 1958. She then proceeded to Rotterdam, Netherlands, on November 17, 1958, and on November 19, 1958, she departed Rotterdam bound for Mobile, Alabama, arriving there on December 6, 1958, at 6:21 p. m. There is no dispute about the fact that when the 683 coils of wire were loaded aboard at Antwerp, Belgium, on November 15 or 16, 1958, there were no exceptions noted to its condition. The coils were wrapped in what appeared to be waterproof paper, and no tears or stains on the paper were noted by the cargo checkers. A clean bill of lading was issued, showing the cargo in "apparent good order and condition." It is also undisputed that when, on December 6, 1958, this cargo was discharged on the dock at Mobile, Alabama, the outturn report shows "Delivered with no exceptions." According to the evidence, no tears in the paper were noted and no stains on the wrappings were visible or

observed by the cargo checkers at the time of outturn in Mobile, and the cargo was thus received from the vessel in apparent good order and condition. While the documents filed in evidence show some discrepancies as to exact dates, it appears that the wire was shipped, via railroad boxcar, to the consignee, Reynolds Metal Company, at Lister Hill, Alabama, on or about December 11, 1958. It apparently arrived there on or about December 18, 1958, and was placed in Reynolds' warehouse. As near as can be determined from the evidence, the first time that any exception was taken to the condition of the cargo was on December 19, 1958, when Reynolds requested that a survey be made. This survey was held on December 29, 1958 by Mr. R. F. Oliphant, an agent of Lloyds of London, and Mr. Edgar J. Brantley, an independent Marine Surveyor. At that time the surveyors reported "signs of rust" on the outside of the paper wrappings and reported that the coils were "wrapped in crape paper (waterproof)." The survey report further noted that the "wire showed light rust and corrosion in scattered areas." Mr. Brantley testified that the stains found on the paper wrapping were on the outside only and that they may have resulted from the bundles coming in contact with other things, such as the dock, the fork lift truck, or other cargo.

After this survey was made, samples of the wire were sent to the A. W. Williams Inspection Company, Inc. for chemical analysis. Mr. Alexander May, a chemist in the employ of A. W. Williams Inspection Company, Inc. who assisted in making the chemical analysis of the wire samples stated that his inspection revealed a lack of uniformity of the galvanizing which he concluded was due "to scme exterior condition." He found a "light pitting and corrosion of the zinc coating." Even though the chemical analysis revealed no sodium chloride (salt) present, he still concluded that the wire had been "emersed in sea water." But he further concluded that if the wire was wrapped

in waterproof paper, no water would have gotten to the wire.

Mr. Morris Miller, another chemist who worked with Mr. May in making the chemical analysis of the wire samples, also found no sodium chloride present. He stated that the salt could have been rinsed off by rainwater, but that it was unlikely that the salt particles, if previously present, would fall off or be knocked off in handling. He stated that the salt crystals would " * * * have a tenacious hold on the metal itself and they are not very readily removed by just normal handling." There was no evidence that the wire had ever been exposed to rainwater.

While Mr. Harrison K. Thornton, a chemist for the Southern Railway Company, said he found evidence of chloride and sodium, he found no evidence of the presence of sulphates which are contained in sea water. He concluded that he could not testify that sea water had caused the damage, even though the presence of chlorides and sodium might indicate the presence of salt water.

Mr. Cecil M. Shilstone, another chemist, testified that the tests performed by the A. W. Williams Inspection Company, Inc. were too elementary and too inadequate to arrive at any reliable conclusion. It was his opinion that if sodium chloride had been present in quantities enough to corrode the wire, it would not have fallen off of the wire during handling, and would have been easily detectable upon proper chemical analysis. It was his further opinion that the corrosion could have been caused by improper procedures followed during the "pickling and galvanizing" of the wire.

Thus there is certainly no preponderance of evidence pointing to the fact that this cargo of wire was caused to corrode because of its contact with sea water. It is true that during the voyage from Antwerp to Mobile, several days of heavy seas were encountered when the vessel took water over her deck. But soundings were taken at regular intervals and there was never more than the normal amount

of water, two or three inches, in the bilges, and hence there is absolutely no evidence that this wire was ever "emersed in salt water." Indeed, the evidence shows that it was not necessary at any time during this voyage to even turn on the bilge pumps. Libelant makes much of the fact that on various occasions during the voyage, the ventilating system was operated whereby No. 1 hold, where this cargo was stowed, was ventilated. It is libelant's contention that if this were done during times when salt spray was over the deck, the ventilators would have sucked it into the hold. But the evidence simply does not bear out this contention. The evidence clearly shows that the only time that these ventilators were operated was when there was clear weather, or when there was no spray over the forward deck of the vessel. Whenever the weather was bad, or whenever there was spray over the forward deck, the log shows that the No. 1 hold ventilators were shut off. Furthermore, there was other cargo such as wire nails, steel wire, machine parts, and barbed wire stowed over, under, and around the wire here involved. This other cargo was certainly susceptible of corrosion, but there is no evidence to indicate that any of it did, in fact, corrode.

■ Libelant predicates his claim on the fact that when the wire was loaded aboard in Antwerp, a clean bill of lading was given showing the wire "shipped in apparent good order and condition," with no exceptions being shown, and that when it was received by the consignee in Lister Hill, Alabama, the wire was not, in fact, in good condition but instead was damaged by corrosion. But libelant offered no proof to show that the wire was, in fact, in good condition when loaded at Antwerp. It relies entirely on the bill of lading's statement that it was "in apparent good order and condition." But as stated in The Niel Maersk, 91 F.2d 932 (CA 2–1937), cert. den. 302 U.S. 753, 58 S.Ct. 281, 82 L.Ed. 582:

"The recitals of 'apparent good order and condition' in the bills of lading furnished only prima facie proof of the external condition of the bags. * * * The shippers had the burden of establishing that their merchandise was in actual good order and condition at the time of shipment. (Citing Cases.) This burden was not sustained, and libelants accordingly must fail in their effort to recover damages against the carrier."

■ While libelant relies entirely on the clean bill of lading to show the condition of the cargo when loaded aboard, he sustains his burden of proving damage in transit only when the condition of the goods at outturn is utterly inconsistent with the representation of "apparent good order and condition" contained in the bill of lading at the time of loading. Hecht, Levis & Kahn, Inc. v. Isthmian Steamship Company, 149 F.Supp. 373 (SD N.Y.—1957). Libelant here had failed to show such inconsistency. This cargo was loaded in Antwerp "in apparent good order and condition" and it was discharged in Mobile, Alabama, "in apparent good order and condition." Thus, by libelant's own proofs a prima facie case has been presented to the effect that this cargo was discharged in Mobile, Alabama from the SS AARDIJK in as good condition as that in which it was received aboard in Antwerp, Belgium. The clear bill of lading created a presumption that the wire, when loaded in Antwerp, was in good condition, and libelant has failed to establish that it was in a damaged condition when discharged in Mobile. Indeed, the cargo checker's report shows, on the contrary, that it was in apparent good condition when discharged. Thus libelant has not made out a prima facie case of damage in transit. Otis McAllister Export Corp. v. Grancolombiana (N.Y.) Inc., 216 F.Supp. 756 (ED La.1963). Furthermore, libelant's failure to give notice of damage at the port of discharge before or at the time of discharge is prima facie evidence of delivery by the carrier of the cargo in good condition. 46 U.S.C.A. § 1303(6). This presumption has not been adequately rebutted. Respondents have, on the other

hand, shown by a preponderance of the evidence that there was no negligence or lack of due diligence on their part in the reception, loading, handling, stowing, carrying, or discharging of the goods carried. The evidence is wholly inadequate to prove that this wire was in any way damaged between the time of its being loaded aboard the SS AARDIJK in Antwerp, Belgium, and the time of its discharge in Mobile, Alabama, and thus libelant's claim against these respondents for cargo damage must be denied. Decree will be entered accordingly.