Fritz W. Alexander, II, J.
In this nonjury action, plaintiff sues for damage caused to “ 800 rolls of hard galvanized wire ” which was shipped from Antwerp, Belgium to New York under an ocean bill of lading issued by the defendant. The wire was loaded into a container owned and supplied by defendant at Hemiksem, Belgium. Indorsed in bold letters on the face of the bill of lading issued June 6, 1970 by defendant is a legend which says in part: ‘ ‘ 'Containers to be stowed under deck. On-deck stowage not permitted.” In addition, the bill of lading called for “house-to-house traffic — Shippers load and count.” No exception to the “ apparent good order and condition” of the goods was taken on the bill of lading.
Transocean carriage of the container, aboard the M/S Rubens originated in Antwerp, Belgium on June 6,1970, and terminated at Port Elizabeth, New Jersey on June 17,1970. The container was off-loaded onto the wharf where it remained, apparently on “ free-time ” until June 22. The containerized goods were to travel overland to plaintiff’s consignee, National Hanger Company in Yonkers, New York via the Big Red Chief Trucking Company, engaged for this purpose by the consignee.
*353 On June 22, the container was opened for customs inspection in the presence of the Big Bed Chief driver and resealed. The driver receipted the “ tally and delivery, record for House Container Delivery ’ ’ and took no exception to the good order and condition of the wire.
On the following day, June 23, the .shipment was delivered to National, in Yonkers, where within less than two hours of arrival the container was opened and inspected by Mr. DeMuro, National’s plant manager. He observed “white rust” on the wire (its original condition was described as ‘ ‘ Silver Bright G-alvanized wire”; it was to be used for clothes hangers); rejected the shipment and called plaintiff to complain of the damaged condition of the wire.
The shipment was taken to the trucker’s warehouse in Brooklyn, where a survey, requested on July 2,1970, was conducted on July 6. No representative of defendant was present at the survey nor does it appear that they were invited.
The survey inspection revealed that 25% of the bundles of wire were severely affected by corrosion, and discoloration, with 75% light to moderately affected by corrosion and discoloration. Chemical tests were perf armed that showed no chlorides present. The container was examined, revealing a patched hole in the roof ‘ ‘ 6x6 ’ ’, located at the right side rear. The container doors were found to be slightly distorted or buckled. The inside of the doors were water streaked from top to bottom and the floor of the container, in the vicinity of the doors, was wet, as was the packing paper and polyethylene sheeting that had been placed thereon. The surveyor reported that there had been rain on June 17 (light), 18, 21, 22 (light), June 26 (heavy at times) 27, 30 (light), July 3, 4 and 5. It was his opinion that the corrosion resulted from “fresh water wetting”; that there had been ‘ ‘ penetration of water within the container ’ ’ and 1 ‘ insufficient ventilating ’ ’ that 1 ‘ caused resultant sweating of the cargo,” Mr. Bebel, the surveyor, testified that the wetting must have occurred more than 10 days prior to his inspection, that the wire had seriously deteriorated “ which doesn’t happen overnight”. On cross-examination he conceded that oxidation could occur in 7 to 10 days, more or less, and that it had rained heavily on June 26.
Defendant argues variously that because the goods were containerized and thus not visible for inspection at delivery to the vessel, plaintiff must affirmatively demonstrate their good order and condition and may not rely upon the clean bill of lading; that the consignees’ driver’s failure to note any excep *354 tian on the tally and delivery record and the failure of plaintiff or the consignee to give written notice of the claimed damage within three days creates a presumption of good order and condition on delivery pursuant to the provisions of subdivision (4) of section 1303 of title 46 of the United States Code; that the ‘ ‘ House to House ’ ’ transit clause on the bill of lading terminated its responsibility at wharfside and that since the proof discloses a heavy rain on June 26 (some 10 days before the survey) plaintiff has failed to establish satisfactorily that the damage did not occur after the goods left the possession of the carrier.
There can no longer be any question that a prima facie case of “ good order and condition” at shipment is established by the introduction into evidence of a clean on board bill of lading (U. S. Code, tit. 46, § 1303, subd. [4]; Interstate Steel Corp. v. S. S. “ Crystal Gem ”, 317 F. Supp. 112). “ The burden of proving that such damage was not due to its negligence or was occasioned by one of the ‘ excepted clauses ’ enumerated in section 1304 (2) of COGSA is then cast upon the carrier.” (Interstate Steel Corp. v. S. S. “ Crystal Gem ”, supra, p. 118.)
No persuasive authority has been cited by the defendant nor discovered by independent research to support the proposition that the rule is in any way abrogated where “ containerized ” cargo is involved. It has been held that the words “ in apparent good order and condition ’ ’ ordinarily refer to ‘ ‘ defects which are visible or are fairly ascertainable * * * or stated otherwise, the bill of lading is prima facie evidence as to external conditions only”. (Samincorp South Amer. Min. S Mdse. Corp. v. S. S. Cornwall, 240 F. Supp. 327, 328.)
Literally interpreted, this language would seem to indicate that where goods are containerized and sealed prior to delivery on board, the clean bill of lading would only be referable to the apparent good order and condition of the container and not the goods within. It is clear, however, that such an interpretation, in this day of increasing use of containerization would nullify the statutory rule of subdivision (4) of section 1303 of title 46 (Carriage of Goods by Sea Act of 1936 [“ COGSA ”]; U. S. Code, tit. 46, §§ 1300-1315). In any event, plaintiff’s proof has more than satisfied this court that the wire was in fact in “ good order and condition ” when loaded into the container and taken aboard defendant’s vessel.
Giving careful consideration to all the proof adduced and weighing the inherent probabilities in both the testimony and the documentary proof, I am satisfied that the wetting and resultant damage to the wire occurred while the goods were in *355 defendant’s possession and prior to delivery to plaintiff’s consignee. In reaching this conclusion, credence is given to the testimony of Mr. DeMuro that within two hours of the containers’ arrival in Yonkers, an inspection of the contents disclosed its damaged condition which caused him to reject the shipment. Not overlooked is the absence of any exception taken by the trucker’s driver on the “ Tally and Delivery Record ”; but it is noted that the driver was not called as a witness nor was there any proof that he made any inspection for damage or indeed that he was in any way qualified to recognize the condition of the wire as damaged, had he in fact made such an inspection. The weather records show that there had been four days of rain during the nearly one week the goods were on the pier; the damage was caused by “fresh water wetting ”, and the container doors were damaged and the floor wet in the vicinity of the greatest damage. All these circumstances compel the conclusion that the damage resulted from the fault of the defendant.
While the failure to take exception to the condition of the goods at delivery, or in writing within three days of delivery creates an assumption that the goods were in good condition at delivery, it does not ban affirmative proof of actual damage condition. (U. S. Code tit. 46, § 1303, subd. [4].)
The question of the meaning of “ House to House ” transit is not reached, nor is it necessary to reach a definition of that term since the proof establishes that the goods were damaged while in the possession of the carrier. That damage was demonstrated to represent a loss of $4,428, that sum being the difference between the fair market value of the goods before and after the damage.
The foregoing opinion constitutes findings of fact and conclusions of law as provided for in the CPLR. If more formal findings and conclusions are required, they may be settled on notice.
Accordingly judgment is directed to be entered in favor of the plaintiff against the defendant in the sum of $4,428, together with costs interest and disbursements.