**EMPIRE ALUMINUM CORPORA-TION, Plaintiff,**

v.

**SS KORENDIJK, her engines, boilers, etc., et al., Defendants.**

**EMPIRE ALUMINUM CORPORA-TION, Plaintiff,**

v.

**OLD DOMINION FREIGHT LINE, Defendant.**

Civ. A. Nos. 2939, 2984.

United States District Court,
S. D. Georgia,
Savannah Division.

Sept. 5, 1973.

Spencer Connerat, Jr., Connerat, Dunn, Hunter, Houlihan, Maclean & Exley, Savannah, Ga., McHugh & Heckmann, Smith & Leonard, New York City, for plaintiff.

George H. Chamlee, Chamlee, Dubus & Sipple, Savannah, Ga., Wilson & Walker, New York City, for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

LAWRENCE, Chief Judge.

### I

### FACTS

On June 29, 1972, Empire Aluminum Corporation filed a diversity action in this Court against Old Dominion Freight Line (formerly Nilson Motor Express) alleging that on or about August 13th–14th, 1969, defendant accepted for shipment to Empire 84 coils of aluminum sheets in good order and condition to be delivered to Newnan, Georgia under bill of lading.[1] It was alleged that the cargo in question arrived at destination "water-damaged", in violation of the obligations of the motor carrier and that such damage amounted to $25,078.81.

Two years before filing that action, Empire brought suit in admiralty in the United States District Court, Southern District of New York, involving the shipment of the same cargo. The defendants were the S.S. "Korendijk" and Holland-Amerika Lijn. The complaint alleges that on July 19, 1969, aluminum sheets were shipped aboard the "Korendijk" from Antwerp to Savannah. The cargo was delivered to the carrier in good order and condition but were not received at Savannah in like condition. The sheeting had suffered water damage in the amount of $25,100 for which recovery was sought by Empire Aluminum Corporation against the vessel and the shipowner.

The New York action was transferred in 1972 under 28 U.S.C.A. § 1404(a) to the Southern District of Georgia for convenience of parties and witnesses and in the interest of justice. Thereafter, the two suits were consolidated as common questions of law and fact were involved. The parties in the diversity action waived a jury and the two cases were tried together in this Court on August 8, 1973.

Three ocean bills of lading were issued by Holland-Amerika Lijn on July 19, 1969, covering 84 pallets of aluminum sheeting that were to be shipped from Antwerp aboard the "Korendijk" to Savannah. Each bill contained the language, "SHIPPED, in apparent good order and condition" and there was an instruction to "KEEP DRY". No evidence was introduced on behalf of Empire with respect to the condition of the aluminum coils at time of delivery to Holland-Amerika Lijn or to the "Korendijk". The aluminum sheeting was shipped to Empire Aluminum Corporation. It sold aluminum to Douglas & Lomason which has a plant at Newman, Georgia, that produces automotive trim.

Delivery of the aluminum sheets was made to Georgia Ports Authority at Savannah on August 6, 1969, shortly after the "Korendijk" docked or one or two

---

1. The aluminum coils are 28 inches to 40 inches high. The sheets are 14 to 15 inches wide and are from 1500 to 4000 feet in length. The sheets are tightly rolled in coils which are packed on pallets and wrapped in waterproof paper. There is a protective covering of polyethylene.

days later. Inspection of the exterior of the cases was made by employees of the Authority at the time of delivery to the inland carrier, Old Dominion Freight Line. Under Antwerp bill of lading #6002, 47 pallets of aluminum were received at Savannah. Notation was made that 10 had torn covers; that another pallet was broken on the bottom and another at the top; that the top frame on one of the cases was loose, and boards cracked at the top of another case. Bill of lading #6003 covered 15 pallets as to which exceptions were noted as to torn covers on 8 and a broken board on top of another. Inspection by Georgia Ports Authority of the 22 pallets covered by #6004 revealed that bands were broken and covers torn on 9 of such pallets.

John H. Denmark who is employed by Georgia Ports Authority as a warehouse superintendent was unable to say whether the coils of aluminum were left on the dock at Berth 57 or had been placed in Shed 5 after discharge from the "Korendijk". It was the custom, he said, to place aluminum cargo in the shed and he did not recall seeing any of the pallets outside. A driver named Doles who transported a truckload of the aluminum cargo in question from Georgia Ports Authority to Old Dominion's terminal at Savannah said that the pallets were on the dock side of the vessel and not under the shed. He testified that he placed a canvas tarpaulin on top of the cargo.

Old Dominion noted no exceptions at time of the delivery to it of the 84 pallets. Empire's shipping order [2] provided that the aluminum sheets would be delivered by Old Dominion by "flatbed trailer". There was a notice thereon that "THIS MATERIAL MUST BE KEPT DRY AND PROTECTED FROM WATER AND MOISTURE".

Charles L. Sullivan of Savannah, a Marine Cargo Surveyor, conducted an investigation of the claim of damage. Following Empire's report that some of the aluminum sheets had been damaged by water, he visited Newnan on three occasions. He examined the 84 pallets involved.[3] He said that some of the strips had been exposed to water. They were set apart. According to Mr. Sullivan, the consignee rejected a total of 158,055 pounds of aluminum which had a scrap value of 20 cents per pound and a market value of nearly 36 cents per pound. It was the witness's opinion that the damage which consisted of staining occurred through contact with fresh water and that same took place between Savannah and Newnan. Applying the silver nitrate test to samples of the outer and inner paper wrapping and the wooden material on the skidding, no salt reaction resulted and such negative result was proof positive of absence of saline content.

Mr. Sullivan produced Department of Commerce records containing climatological data for the period involved. The record showed heavy rainfall at or near Milledgeville, Macon, Fort Valley and Mt. Vernon which are located along possible truck routes to Newnan. There was heavy rain at Savannah and much less extensive precipitation at Newnan.

He stated that the rejected aluminum was covered with whitish oxidation with the surface being somewhat pitted as in cases of rust. This occurs when aluminum oxidizes after being wetted by fresh or salt water. It was conceded by all that the damaged sheets were unfit for use. They were disposed of as salvage. The value of the aluminum in good condition was $56,784 and in the damaged state, $31,705. A settlement

2. It is also referred to in the evidence as a bill of lading but it is not. Apparently, no bill of lading as such was issued by the motor carrier.

3. It appears that 47 of these pallets left Savannah for Newnan in trucks on August 13, 1969, and that on August 14th the remaining 37 were shipped from Savannah by truck. Fifty-six arrived at destination on August 14th, fourteen on August 15th and the final fourteen pallets on August 18th.

with Empire was effected by the cargo insurer in the amount of $25,000 under loan receipt.

Five possibilities exist as to the time the damage to the aluminum sheets occurred:

(A) Damage prior to shipper's delivery to the "Korendijk".

(B) Damage aboard that vessel enroute to or at Savannah.

(C) While at dockside or under shed at Georgia Ports Authority.

(D) In transit to Newnan after delivery to Old Dominion.

(E) Damage after delivery to Empire at Newnan.

## (A)

### Damage Prior to Delivery to Ocean Carrier

As stated, Holland-Amerika issued clean bills of lading which recited that the goods were shipped in apparent good order and condition. There were no exceptions therein. The tightly-rolled coils were wrapped in polyethylene wrappers. Outside of that covering was a heavy pasteboard wrapping. An open skidding or crate arrangement was on top and was strapped to the base. Metal bands bound the circumference of the coils. The polyethylene wrapped at the top was folded over but not sealed. As a result, the package is not absolutely watertight.

No evidence was presented by the shipowner as to the condition of the aluminum cargo when delivered to Holland-Amerika and shipped from Antwerp under the three bills of lading. There was no effort by the ocean carrier to overcome the rebuttable inference of good order on delivery to it arising from the issuance of clean bills.

## (B)

### Damage to Aluminum Coils While Aboard "Korendijk"

The master of the "Korendijk", A. C. Timmermans, testified by deposition that the vessel sailed from Antwerp on July 20, 1969. Her log showed that bilge soundings were made in the hold where the cargo in question was stored on the following day. It proved normal as did all other such soundings during the voyage. On one occasion there was heavy weather with water on the deck and over the hatches. At Bermuda No. 2 hatch was opened. No damage to the cargo was observed. The log of the "Korendijk" reflects that the weather was good at Savannah. No water damage to other cargo aboard the vessel was reported. I previously discussed the result of the inspection of the pallets by agents of Georgia Ports Authority. None of the exceptions they noted were necessarily associated with water damage to exterior and interior. The Authority does not open cases, cartons, etc. for interior inspection. Such is impractical.

## (C)

### Damage to Coils While at State Port Dock Prior to Delivery to Old Dominion Freight Line

If the water damage occurred at the State Port docks, that fact would have no bearing on the liability of "Korendijk". The shipowner's responsibility ended with the discharge of the cargo at Savannah when it came to rest on the dock. The fact of damage at that point would, of course, affect Old Dominion. The condition of the coils at the time of their delivery to the inland carrier is critical to its liability for the damage discovered at destination.

I touched earlier on the subject of possibility of water damage occurring while the pallets were on the open dock at the Authority's terminal. It will be recalled that an Old Dominion driver testified that when he picked up a truckload of the coils they were on the dock, not in the shed. A warehouse superintendent of Georgia Ports Authority, Mr. Denmark, could not remember the particular occasion but he did not recall ever storing coiled sheet-type metal outside. Dep., p. 6.

Old Dominion accepted delivery under shipping orders which contained no ex-

ceptions as to good order of the cargo. Of course, any exceptions noted would, in the nature of things, have related to its exterior rather than interior condition. Nothing more than a speculative possibility has been established of damage while on the dock at Savannah following discharge of such cargo.

### (D)

### *Damage Enroute to Newnan*

■ Under Georgia law, motor carriers are bound to exercise extraordinary diligence. In case of loss the presumption of law is against them. Ga. Code § 18–102. Proof of receipt in good order and delivery in damaged condition casts on the common carrier the burden of establishing an affirmative defense. Loo-Mac Freight Lines, Inc. v. American Type Founders, Inc., 100 Ga.App. 203, 110 S.E.2d 566. Where the place of the damage to cargo cannot be established by direct or circumstantial evidence, presumptions weigh heavily. In the conclusions of law I shall deal with presumptions and burden of proof as same affect the condition of the aluminum coils upon the respective delivery to the "Korendijk" and Old Dominion.

Empire's shipping order (Pl. Ex. #4) which Old Dominion treats as a bill of lading acknowledged receipt of 84 packages of aluminum sheet "in good order, except as noted, the contents and condition of packages unknown". As stated previously, there were no exceptions.

The motor carrier produced one of the six drivers involved in the transportation. Robert E. Hargroves testified by deposition that during the entire trip he made, the cargo was protected by a tarpaulin. "That's one of the company policies on aluminum loads. Protect it at all times." Dep., p. 8. Hargroves denied that coils got wet during transit.

The Court inquired during the trial as to whether the water damage to the sheets was limited to that transported on any particular flatbed trailer or trailers. By that time this information could not be developed. There was rejection by Empire of 158,055 pounds out of a total shipment of 264,539 or damage to approximately 60% of the coils. It seems fairly clear that this was distributed throughout *all* the truck movements to Newnan. It would seem unlikely that extensive damage would have occurred to coils stored on six separate trucks involving as many movements when the covering thereof, apart from the use of tarpaulins, was watertight other than the possibility of seepage through the folded polyethylene overlap.

Mr. Sullivan testified that if the polyethylene covers had been sealed, there was a possibility of "self-sweating moisture" on the sheets. Edward Fielding, who is an officer in Empire, has been in the metal business for over twenty years. He had considerable experience with aluminum coils. He stated that he had never seen "moisture staining". It would have to result, Mr. Fielding said, from some dramatic factor such as change from a very cold to a warm environment.

Dr. Cedric Stratton, Professor of Chemistry at Armstrong College, has had a long-time interest in the chemistry of aluminum. He was of the opinion that an inferior alloy could have been furnished by the Belgian manufacturer.[4]

I previously referred to the 10% silver nitrate test made at Newnan by Mr. Sullivan. He testified that it proved negative for presence of salt and that it is a conclusive test. Dr. Stratton challenged the validity of the nitrate test as a means of determining exposure of aluminum to salt water.

The written report by Charles Sullivan, Surveyor, to the underwriters on July 1, 1970, states that his examination of the coils still in storage disclosed that the pasteboard covering was "dry water stained" and that there was rust on the

---

4. I will add that the record reveals no complaint by Douglas & Lomason with the aluminum strips as far as quality of metal was concerned.

metal bands.[5] He testified that the packaging examined by him exhibited light water contact by splashing. Mr. Sullivan concluded: "We are of the opinion that at some time during the course of transit portions of these three shipments were subject to contact with fresh water, in our opinion, rain." Pl. Ex. #1.

I mentioned above the possibility of the staining of the sheets of aluminum by moisture generated by causes other than exposure to water. This is in the nature of inherent vice in the object transported and affords a defense to the carrier. The burden of establishing such defense is on the carrier. Southern Express Company v. Bailey, 7 Ga. App. 331, 66 S.E. 960; Loo-Mac Freight Lines Inc. v. American Type Founders, Inc., *supra,* 100 Ga.App. at 206, 110 S. E.2d 566. Old Dominion did not carry it here; in fact, it did not raise any inherent vice defense.

The report of Mr. Sullivan to the underwriter of ·Holland-Amerika states that at Newnan the Surveyor also examined "shipments ex the S/S 'Astrid Schulte' and the S/S 'Gorredyk' which were received in a similar bad order condition." This evidence which . may have been relevant was not developed at the trial. During my consideration of the case I requested that an affidavit be supplied by Sullivan elaborating on the similar damage to similar shipments consigned to Douglas & Lomason. Counsel consented. The affidavit is in such general terms that it is not particularly helpful. Affiant says that the "similar bad order condition" was found when the goods were placed in production. The packaging was the same and the exceptions on delivery at Savannah were similar to those in the instance of the "Korendijk".

### (E)

### *Damage After Delivery to Douglas & Lomason at Newnan*

At Newnan the carrier's delivery receipts were stamped "Received Subject to Weight, Count & Inspection". Below such stamped entry, the printed form recited, "Received the above described property in good condition except as noted". It appears that after the aluminum coils are delivered to the warehouse of Douglas & Lomason at Newnan they are transported by another truck to its plant which is located a mile across town. The unloading dock at the plant is not covered. See deposition of Robert E. Hargroves, pp. 23–25. As to the suggestion that the damage could have occurred at Newnan after delivery, the observation of this Court on the possibility thereof while stored at the State Docks at Savannah is equally applicable.

### II

### CONCLUSIONS OF LAW

(1) *Presumption of Good Order and Condition of Coils When Received by Holland-Amerika for Shipment to Savannah*

■ The role of presumptions is frequently important in actions against carriers. They are especially significant in the present case where the evidence as to the condition of the cargo on delivery to the carriers and the cause of damage and point where it occurred is both vague and inconclusive.

■ By aid of presumption the plaintiff has sought to establish the sound condition of the aluminum sheeting on delivery to the carrier. Under the Carriage of Goods by Sea Act the bill of lading must show "The apparent order and condition of the goods". 46 U.S.C.A. § 1303(3)(c). The three ocean

---

5. "Examination of the coils ex these shipments which were still in storage and had not been placed in production disclosed the outer pasteboard coverings to be dry water stained with the metal bands showing varying degrees of moderate to heavy rust." Pl. Ex. # 1.

bills of lading issued by Holland-Amerika were clean bills. They acknowledged receipt "in apparent good order and condition". Such constitutes *prima facie* evidence of good condition at time of delivery to the carrier. The receipt is referable to the *external* rather than *internal* condition of the goods. See citations in Barwick Mills, Inc. v. Hellenic Lines Limited, D.C.Ga., 331 F.Supp. 161, aff'd. 472 F.2d 1406 (5th Cir.).[6] The presumption of soundness created by a clean bill of lading is rebuttable by the carrier. Barwick Mills, *supra;* Caterpillar Overseas, S. A. v. S/S Havtroll, D.C.N.Y., 333 F.Supp. 783.

■ The ocean carrier did not overcome the inference that the aluminum coils were in sound order when it received same at Antwerp. In fact, it made no attempt to do so. The aluminum sheeting must (as to that carrier) be regarded as free from water damage at the time the "Korendijk" sailed for Savannah. The carrier had the burden of proving that it did nothing to change the condition of the cargo up to the time of its discharge at destination or that same was not in bad order at outturn. The evidence offered by Holland-Amerika refutes the theory that the goods were damaged while in its possession.[7] The ocean carrier carried the burden imposed on it under the Carriage of Goods by Sea Act. 46 U.S.C.A. § 1300 et seq.

■ Furthermore, that Act requires that unless notice of damage that is not apparent is given in writing at the port of discharge within three days after delivery to and removal of the goods by the person entitled thereto, such removal shall be *prima facie* evidence of delivery as described in the bill of lading. §

1303(6). See Miami Structural Iron Corporation v. CIE Nationale Belge De T. M., claimant of The Gand, 224 F.2d 566 (5th Cir.); Otis McAllister Corporation v. Grancolombiana, Inc., D.C.La., 216 F.Supp. 756; Zack Metal Export Company v. S. S. Birmingham City, 291 F.2d 451, 453 (2nd Cir.). Empire failed to furnish notice of damage.

Plaintiff is not entitled to recover from Holland-Amerika or the "Korendijk" and judgment is rendered in favor of the defendants and against Empire Aluminum Corporation in Civil Action No. 2939.

**(2)** *Presumptions Affecting Liability of Inland Carrier*

■ Under the common law as codified in Georgia Code § 18–102 and 103, the presumption of law is against the carrier and no excuse avails unless occasioned by an act of God or the public enemies of the State. "To make out his case the shipper need only show the delivery in good condition and the receipt in damaged condition; the defendant, to make good his defense must then show that the damage arose from causes unmixed with any negligence on his part." Loo-Mac Freight Lines, Inc. v. American Type Founders, Inc., *supra,* 100 Ga.App. at 206, 110 S.E.2d at 569.

Early Georgia cases favored the shipper in respect to proof of good order at the time goods are delivered to a carrier. In Henry v. The Central Railroad & Banking Co., 89 Ga. 815, 15 S.E. 757 which involved a bill of lading that acknowledged receipt "in apparent good order", the Court held that where it does not appear that the carrier received goods in bad order or where they were

---

6. Compare M. Paquet & Co. v. Dart Containerline Company, Inc., 343 N.Y.S.2d 446, 1973 AMC 926 in which containerized cargo was involved. The District Court ruled that the clean bill of lading issued by the carrier was referable not only to the apparent good order of the container but also to the condition of the goods within it.

7. *Cf.* Gerber & Co., Inc. v. Holland-Amerika Lijn, *supra,* 261 F.Supp. 893 at 895: "It is

true that during the voyage from Antwerp to Mobile, several days of heavy seas were encountered when the vessel took water over her desk. But soundings were taken at regular intervals and there was never more than the normal amount of water, two or three inches, in the bilges, and hence there is absolutely no evidence that this wire was ever 'emersed in salt water'."

not in fact in bad order, the presumption is that they were in good order. When a common carrier has been in possession of the shipper's property for several days, it is "the duty of the carrier to show that the goods were in bad condition when delivered to him." Ohlen v. Atlanta & West Point R. Co., 2 Ga.App. 323, 328–329, 58 S.E. 511, 514. The Court of Appeals acknowledged that such ruling "imposes a burden upon the carrier for hidden defects in some cases."[8]

■ Later cases make plain that the burden is on the shipper to show in the first instance that the goods were delivered to the carrier in good order. See Loo-Mac Freight Line, Inc. v. American Type Founders, Inc., 100 Ga.App. 203, 110 S.E.2d 566; A. A. A. Highway Express, Inc. v. Bone & Hendrix, 69 Ga. App. 763, 767, 26 S.E.2d 658; Acme Fast Freight Incorporated v. Southern Railway Company, 67 Ga.App. 885, 889, 21 S.E.2d 493; Rome Electric Incorporated v. Railway Express Agency, supra, 81 Ga.App. at 372–373, 59 S.E.2d 19.

In the last mentioned case the Court of Appeals cited a decision from another jurisdiction different in fact only in the existence of a receipt stating "Contents and condition of contents unknown". Such was "merely evidence of the facts recited," remarked the Court. The effect of such language has not elsewhere been judicially treated in this State to my knowledge.

■ Where a bill of lading recites that the goods are received in good order, except that the condition of the contents of the packages are unknown, the burden is on the carrier to prove they were not in good condition when received. On the other hand, the "mere recital in the receipt that the contents and condition of the packages were unknown does not raise a presumption that they were in good order when received by the carrier". See 13 C.J.S. Carriers § 254, p. 538.

■ The ambivalence of the case law in other jurisdictions as reflected in the last citation is shared by that in Georgia. However, I get the impression from the latter that where the real condition of the goods is not apparent the carrier receiving same is not liable in the absence of a showing by shipper that they were in fact in good order when delivered.

In any event, doubt exists as to the governing rule in Georgia in cases where there is a good order receipt of packaged goods.

(3) Effect of Consolidation of Cases upon Proof of Good Order of Cargo (a) at Time of Delivery to Holland-Amerika and (b) at Time of Cargo Delivery to Old Dominion

A presumption of good order of the cargo was created by delivery of the cargo to the "Korendijk" under the clean bill of lading issued by the ocean carrier. Can the shipper avail itself of this presumption in its action against the inland carrier?

■ The two cases were consolidated by order of this Court, it appearing that common questions of law and fact were involved. They were tried together. Under Rule 42, F.R.C.P., consolidation does not so completely merge the two cases as to deprive any party of substantial rights that he would have possessed had the actions proceeded separately. The two suits retain their separate identity. 5 Moore's Federal Practice § 42.02.

Empire had a stake in the condition of the aluminum sheeting at the time of delivery to the ocean carrier as well as receipt by the inland carrier at Savannah. Proving sound order at delivery at Antwerp was a requisite to any recovery from Holland-Amerika. This was done

8. There was a recitation in the bill of lading of receipt in "apparent good order". It has been said that parts of Ohlen are dicta, including the implication that a presumption arises on receipt in good condition merely from the fact that "the carrier received the goods without a noted exception and transported them." See Rome Electric Incorporated v. Railway Express Agency, 81 Ga. App. 368, 371, 59 S.E.2d 19, 21.

by the aid of presumptive rather than substantive evidence. The good order of the coils as so established was nonetheless a *fact*. I am dubious, however, whether such presumptively-established fact can be used by Empire as a starting point for proof of its claim that the same sound condition existed at time of delivery to Old Dominion. That this same inferential evidence should be unavailable to the same shipper in proving, vis-a-vis Old Dominion, the same good condition of the cargo on arrival at Savannah may seem to be funny law.

■ However, while Empire was the shipper in both the overseas and overland movements, the two carriers involved were different and the deliveries to them were separate and distinct. There was no through bill of lading to Newnan. As far as Holland-Amerika was concerned, Savannah was the end of the line. The rebuttable inference of good order of packaged goods created on issuance of a clean bill of lading affects only the issuing carrier. The presumptive effect thereof is governed by admiralty law; that of the bill of lading issued by the inland carrier is governed by Georgia law. The two are not the same.

(4) *"Connecting Carrier" Factor as Bearing on Proof by Old Dominion of Delivery in Good Order to Initial Carrier, Holland-Amerika*

Holland-Amerika contracted with Empire to deliver the cargo at Savannah; the inland carrier from thence to Newnan. The overall movement of the cargo was temporarily broken at Georgia Ports where the goods came to rest for approximately a week. With that exception the transportation from Antwerp to final destination was a single movement by two carriers with the goods in the same packages.

■ The Carmack Amendment to the Interstate Commerce Act (49 U.S.C. A. § 20) is, of course, not applicable, nor is the analogous Georgia statute. Prior to the federal legislation it was the rule at common law that delivery of goods in bad condition when it was sound when received by the initial carrier raises a presumption that the damage occurred on the line of the terminal or delivering carrier. Chicago & Northwestern Railway Company v. Whitnack Produce Company, 258 U.S. 369, 42 S.Ct. 328, 66 L.Ed. 665. Such was and is the presumption in Georgia. See Capital City Oil Company v. Central of Georgia Railway Company, 16 Ga.App. 750, 86 S.E. 57; Central of Georgia Railway Company v. Scrivers, 24 Ga.App. 177, 100 S.E. 233; Lewis et al., receivers v. Joyner, 29 Ga.App. 92, 113 S.E. 829; Central of Georgia Railway Company v. Clark Miller Company, 40 Ga.App. 113, 149 S.E. 77; R. C. A. Truck Lines, Inc. v. Georgia Rug Mill, Inc. et al., 88 Ga.App. 658, 77 S.E.2d 442. In R. C. A. Truck Lines v. Georgia Rug Mills, *supra*, the consignee brought a common law action against the delivering carrier for damage to rubber cement shipped in drums. "A prima facie case," said the Court, "is shown by alleging the delivery of the goods or merchandise shipped in good order to the initial carrier and receipt at the destination from the terminal carrier of the goods in a damaged condition." At 661, 77 S.E.2d at 444. The existence and the effect of the common law presumption in such cases is thus summarized in 14 Am.Jur.2d Carriers § 729:

"In the absence of evidence locating the place of damage to goods in transit over several connecting lines, the almost universal rule is that a presumption arises, where goods are delivered to an initial carrier in good condition and are delivered by the terminal carrier in a damaged condition, that they were injured on the line of the last carrier, and the burden of proof is on the terminal carrier, when sued, to show that the damage was not done on its line. . . ."

■ If the presumptive evidence rule can be used to establish good order of the cargo when delivered to the initial carrier, we are no longer troubled by the problem of condition of the coils on delivery to Old Dominion. The evi-

dence warrants a finding by this Court that the condition was the same at Savannah as at Antwerp. The presumed good order of the cargo when received by the "Korendijk" was not rebutted by either carrier.

(5) *Significance of Absence of Water Stains on Outer Covering at Savannah and Presence of Such Stains at Newnan*

Inspection at Savannah of the exterior of the 84 pallets by representatives of Georgia Ports Authority revealed no staining or other indicia associable with possible damage by water to the contents. Some of the covers were torn, boards were cracked or broken and metal bands were loose. Although it is the Authority's practice to make note of water-stained covers, it recorded none in this instance. While this does not establish absence of water damage to the aluminum coils at Savannah, such is permissible deduction. Changes in the packages were found at Newnan, according to the witness Sullivan who observed water stains on the covering of a number of the packages which were still in storage and not used in production. There was rusting of the metal bands and the outer pasteboard coverings were water-stained at the top.

There was heavy rain at the period in various areas through which the routes to Newnan passed. The silver nitrate test for salt water exposure, which Old Dominion vigorously attacks, was negative. There was a possibility of water getting to the coils through the unsealed polyethylene overlap.[9] The burden of proving that the damage did not occur between Savannah and Newnan was on the inland carrier. It was required to exercise extraordinary care in protecting the goods.

To put things in what amounts to syllogistic form, we have:

(a)

*Fact*: No water stains observed on exterior of pallets at Savannah.

*Deduction*: Absence of exterior stains that are associable with possible water damage to contents indicates that coils were in good order as to damage from water when cargo was delivered to Old Dominion at Savannah.

(b)

*Fact*: Water stains on the coverings observed at Newnan.

*Deduction*: The cargo was wetted in transit from Savannah.

(c)

*Fact*: Water damage to the aluminum sheeting found at Newnan.

*Deduction*: The staining of the coils was the result of contact with water occurring between Savannah and Newnan.

"A coach-and-four" can figuratively be driven through some of this reasoning. I realize that. The point is, however, whether established facts and legitimate inferences furnish a basis for finding that no water damage to the coils existed on discharge of the cargo at the State Port. Since there was no outward evidence of exposure to water, it is reasonable to conclude that the aluminum had sustained no water damage at the time of their delivery to Old Dominion. Water stains were found on the pasteboard coverings at the Newnan plant of Douglas & Lomason. Damage to the contents was therefore a possibility. It was later ascertained that many of the sheets were stained by water and unusable except to be melted and then used. The burden was not on the shipper to prove how and when water got into the sheets. Good order at delivery —damage at destination was shown. Old Dominion has not overcome the presumption thereby created by showing that the damage arose from causes unmixed with its negligence.

Counsel for Empire Aluminum Corporation will submit a form of judgment

9. While the aluminum sheets are very tightly rolled water can penetrate through capillary action.

in Civil Action No. 2984 in the amount sued for plus interest.

Before signing this Order, I offer two comments on the development of evidence in the Empire v. Old Dominion case. The problems of this Court would have been simplified had plaintiff proven delivery of the goods to the ocean carrier in sound condition by other than presumptive evidence. The other observation is that testimony from some official or representative of the consignee might have shed needed light on the condition of the coverings as to water-stain upon receipt of the shipment at the Newnan plant.