**DELTA STEEL, INC. A. M. Castle Co. Cockrill Stinnes Primary Steel Corporation, Plaintiffs,**

v.

**M/S PANAGOS D. PATERAS and BARGE RW–170, in rem Diamond Freighters Corporation Leandros Shipping Co., S. A. Atlantic Lines & Navigation Co., Inc. Riverway Barge Company River Forwarders, Inc., Defendants.**

Civ. A. No. 79–4244.

United States District Court, E. D. Louisiana.

Sept. 20, 1982.

Philip A. Fant, Cynthia Anne Wegmann, New Orleans, La., for plaintiffs.

Norman C. Sullivan, Jr., Robert P. McCleskey, Jr., New Orleans, La., for defendant River Forwarders, Inc.

T. C. W. Ellis, New Orleans, La., for defendant Riverway Barge Co.

Kenneth W. Jacques, New Orleans, La., for defendant Atlantic Lines & Navigation Co.

Maurie D. Yager, New Orleans, La., for defendants Diamond Freighters Corp. and Leandros Shipping Co.

CASSIBRY, District Judge:

This is an admiralty and maritime claim for cargo damage. The plaintiffs filed suit to recover $70,000 in damages resulting from water damage to coils of cold rolled steel sheet carried aboard the M/V PANAGOS D. PATERAS from the Port of Brake, Belgium to the Port of New Orleans, and then transported by Barge RW–170 to Cotoosa, Oklahoma. Named defendants in the action are Diamond Freighters Corporation and Leandros Shipping Co., S. A., owner, manager and/or operator of the PANAGOS D. PATERAS; Atlantic Lines & Navigation Company, Inc., charterer of the PANAGOS D. PATERAS; Riverway Barge Company, owner of the Barge RW 170; and River Forwarders, Inc., the freight forwarder

which issued its inland bill of lading for the carriage of the cargo from New Orleans to Catoosa.

During the pendency of this suit, Riverway Barge Company and River Forwarders, Inc. entered into a release and assignment with the plaintiffs whereby the plaintiffs were paid $48,000 in settlement. The plaintiffs thereby assigned and transferred to Riverway Barge Company and River Forwarders, Inc. all right, title and interest in this cargo damage claim. This release and assignment was not participated in or agreed to by the other defendants, Diamond Freighters Corporation, Leandros Shipping Co., S. A., or Atlantic Lines & Navigation Company, Inc.

Thus, Riverway Barge Company and River Forwarders, Inc. are now each contending that the other is liable and/or that liability rests with the ocean carrier that transported the cargo from Belgium to the Port of New Orleans. The parties agreed to forego trial and, instead, to submit the case to the court on briefs. For the reasons discussed below, I find that no fault, negligence, or breach of obligations on the part of the owner or charterer of the PANAGOS D. PATERAS contributed to the wetting of the cargo in Barge RW–170. I further find that Riverway Barge Company alone is the liable party because Riverway breached its duty to properly load, stow, care for and deliver the cargo.

## FINDINGS OF FACT

### 1.

On June 28, 1979, a consignment of 63 coils of cold rolled steel sheet was delivered to Diamond Freighters Corp., Leandros Shipping Company, S. A., Atlantic Lines & Navigation Co., Inc. and the M/V PANAGOS D. PATERAS at the Port of Brake, Belgium. This cargo was to be carried aboard the PANAGOS D. PATERAS to the Port of New Orleans.

### 2.

On July 31, 1979, the PANAGOS D. PATERAS arrived at the Harmony Street Wharf in the Port of New Orleans, where the cargo was to be discharged to Barge RW–170 for carriage to the Port of Catoosa, Oklahoma.

### 3.

On August 1, 1979, Barge RW–170 arrived at the side of the PANAGOS D. PATERAS, fit to receive the cargo; however, the cargo was not loaded aboard the RW–170 until August 4, 1979.

### 4.

Some rain occurred at the Harmony Street wharf on August 2, but there is no evidence that rain occurred there on August 4, the date that the steel sheet cargo was discharged by the stevedore, T. Smith & Son, Inc., to Barge RW–170. At the time of the discharge of the cargo, the covers of the coils in question were noted to have some rust, this condition being consistent with the exceptions appearing on the ocean bills of lading. (When the steel coils were loaded aboard the PANAGOS D. PATERAS in Belguim, the bills of lading issued by Atlantic Lines & Navigation Company, Inc., noted the existence of some rust).

### 5.

At some time prior to the discharge of the cargo from the PANAGOS D. PATERAS in New Orleans, River Forwarders was contacted to provide a barge for carriage of the cargo to the Port of Catoosa, Oklahoma. River Forwarders issued a bill of lading dated August 4, 1979 to States Shipping Agency of Houston, Texas, who was acting as agent for Atlantic Lines & Navigation Company, stating that River Forwarders would provide carriage of the coils of steel from New Orleans to Catoosa, Oklahoma. Because River Forwarders does not own any barges or tugs, they then contacted Riverway Barge Company to supply a barge and tug to receive and carry the cargo.

### 6.

Riverway Barge Company supplied Barge RW–170, which it owned, to receive the cargo and issued its bill of lading to River Forwarders for carriage of the cargo to Catoosa.

**7.**

After the steel coils were loaded onto the Barge RW–170 on August 4, 1979, the barge departed from the Harmony Street wharf. On August 6, 1979, at another wharf in New Orleans, additional steel products were loaded from the M/S DICTO into Barge RW–170. On August 10, 1979, the barge returned to the Harmony Street wharf for other shipments. Although T. Smith & Son stevedoring company loaded both the August 6 and August 10th cargo, this cargo was not loaded for the account of the PANAGOS D. PATERAS interests, and those interests had no further connection with the barge after the coils of steel were discharged to the barge on August 4, 1979.

**8.**

There was no evidence of water in the barge's cargo compartment when the coils were discharged from the PANAGOS D. PATERAS on August 4. The barge's covers were closed after the coils were loaded, and when employees of T. Smith & Son, Inc., reopened the barge on August 6, and again on August 10, to load the additional consignments, no water in the barge was observed.

**9.**

Barge RW–170 next traveled inland to Muskogee, Oklahoma, where other cargo was offloaded on August 24 and August 27 by Will Bros. Terminal Company. Only the forward 1, 2, and 3 covers on the barge were opened, and cargo in that area offloaded. On August 27 there was about half an inch of rain in Muskogee.

**10.**

Barge RW–170 next traveled upriver to Catoosa, Oklahoma, arriving on September 8, 1979, where water was found standing in the barge's cargo compartment with some of the steel coils having been wetted.

**11.**

If rain is encountered while T. Smith & Son, Inc., is loading a barge in the Port of New Orleans, a notation on the Daily Working Report concerning rain and detention time is made and then the detention time is charged to T. Smith's client since the long-shoremen continue to get paid during this period of time. Additionally, if the client employing the stevedores requires the stevedores to work during the rain, the longshoremen are paid double time.

**12.**

If the longshoremen are required to work in a barge which contains water, the union contract requires them to be paid double time and therefore a notation on the Daily Working Report relative to double time and water in the barge would be present.

**13.**

The T. Smith & Son terminal superintendent testified in his deposition that if water were present in the barge while the barge was in the Port of New Orleans, this water would have been detected by the longshoremen who worked the barge and they would have sought double time with the appropriate notations being contained on the Daily Working Reports.

**14.**

The Daily Working Reports of T. Smith & Son, Inc., contain notations for rain only on July 31, 1979 and on August 2, 1970. Barge RW–170 was not being loaded on either of these two days alongside the PANAGOS D. PATERAS nor was the number 7 hold of the PANAGOS D. PATERAS, where the steel coils were stowed, being worked on either of these two days. There are no notations on the Daily Working Reports indicating rain on August 4, 6, or 10, 1979.

**15.**

It is the policy of T. Smith & Son, Inc. to close the hatches of barges when rain is encountered and to close, secure, and lock hatches of barges prior to their leaving the custody of T. Smith & Sons, Inc. when barges contain cargo such as the steel coils involved in this case.

**16.**

If Barge RW–170 had come alongside the PANAGOS D. PATERAS on August 4, 1979 with a list or with water in the hopper, the Policy of T. Smith & Son would have required that the barge be rejected. The

barge was not, of course, rejected on this date.

**17.**

The superintendents in charge of Barge RW–170 on August 4, August 6, and August 10 were experienced and were aware of all of the above-mentioned policies of T. Smith & Son, Inc. The derrick foreman who had responsibility for closing the hatches of Barge RW–170 on August 10, 1979 had fifteen years of experience and was well aware of the policy of T. Smith & Son concerning the closing of hatches at the completion of loading operations. The policies of T. Smith & Son were, in fact, followed during the loading of the Barge RW–170.

**18.**

On behalf of Riverway Barge Company, a marine surveyor inspected the steel coils in a warehouse at Catoosa, Oklahoma on September 11. He found that eighteen coils had marks indicating that they had rested in water ranging in depth from one-half inch to eleven inches. These marks, on the exterior of the coils, appeared to be fresh.

**19.**

After examining the coils in the warehouse, the surveyor inspected the barge and found that it still contained standing water in the aft portion of its cargo compartment. The surveyor observed heavy, fresh, orange rust on the hopper floor, slope, sheet and walls under the number 1, 2, and 3 covers on Barge RW–170.

**20.**

The surveyor stated that "due to the heavy orange rust in the area of the number 1, number 2 and 3 [cargo] covers, this is the most probable place for the water to have entered the cargo hopper."

**21.**

The surveyor obtained no information or any physical evidence to indicate that any water entered Barge RW–170 during its movement from the Port of New Orleans to the Port of Muskogee, Oklahoma.

**22.**

Barge RW–170, provided by Riverway Barge Company, was seaworthy. The barge was dry and fit to receive the cargo on August 4, 1979, and the barge was watertight throughout the voyage.

**23.**

There is sufficient evidence to reasonably conclude that the water which gained entry into Barge RW–170, and which wetted and rusted the cargo, occurred in the areas of the number 1, 2, and 3 cargo covers after these covers were handled by the Will Bros. Terminal in Muskogee, Oklahoma.

## CONCLUSIONS OF LAW

**1.**

This matter falls within the admiralty and maritime jurisdiction of this court, and venue is properly laid in the Eastern District of Louisiana.

**2.**

■ The Carriage of Goods by Sea Act, 46 U.S.C. § 1300 *et seq.,* is applicable to the ocean transportation of the cargo from the Port of Brake, Belgium, to the Port of New Orleans. The ocean bills of lading issued by the charterers of the PANAGOS D. PATERAS, Atlantic Lines & Navigation Company, Inc., contained exceptions for some rust, which condition was noted when the goods were discharged from the ship in New Orleans. There was no evidence to suggest that the coils had sustained any damage during carriage to the Port of New Orleans; they were in the same apparent order and condition as when received in the Port of Brake. After the steel coils had been properly unloaded from the PANAGOS D. PATERAS to Barge RW–170 on August 4, 1979, the ocean carrier had fulfilled its duties and obligations under the contract of carriage. There was no evidence that the ocean carrier failed to discharge its duties and obligations with respect to the cargo.

**3.**

The wetting of the coils was first discovered at Catoosa, Oklahoma, on about September 8, 1979, and it was found that there

was water standing in the barge's cargo compartment. Under these particular circumstances, the inland carrier, as the final carrier and custodian of the goods, must rebut the presumption that the damage occurred while the cargo was in its custody and that the damage was occasioned by its fault. *Empire Aluminum Corporation v. SS KORENDIJK,* 391 F.Supp. 402 (S.D.Ga. 1973); *Robert Badenhop Corp. v. N. V. Koninklijke P–M.,* 1960 A.M.C. 2114 (S.D.N. Y.1960); *Julius Klugman's Sons v. Oceanic Steam Navigation Co.,* 42 F.2d 461 (S.D.N. Y.1930).

4.

That the coils were wetted while in Barge RW–170 has not been disputed. When loaded into the barge, the coils were in the same apparent order and condition as when received by the PANAGOS D. PATERAS interests, and neither Riverway Barge Company nor River Forwarders, Inc., has met its burden of establishing that the goods became wetted in the barge as a result of any fault, neglect, or breach of obligations on the part of the PANAGOS D. PATERAS interests. Although the PANAGOS D. PATERAS interests would clearly be liable if their agent, T. Smith & Son, Inc., had negligently unloaded, handled, stowed, or otherwise cared for the cargo, I find no negligence on the part of T. Smith & Sons, Inc. while employed by the PANAGOS D. PATERAS interests. *Interstate Steel Corp. v. SS Crystal Gem,* 317 F.Supp. 112 (S.D.N. Y.1970); *David Crystal, Inc. v. Cunard S. S. Company,* 339 F.2d 295 (2d Cir. 1964), *cert. denied,* 380 U.S. 976, 85 S.Ct. 1339, 14 L.Ed.2d 271 (1965).

5.

■ Carriage of the cargo from the Port of New Orleans to Catoosa, Oklahoma, and the River Forwarders and Riverway Barge Company bills of lading issued in conjunction therewith, are governed by the provisions of the Harter Act. 46 U.S.C. § 190 *et seq.*

6.

■ Pursuant to the provisions of the Harter Act, Riverway Barge Company is responsible to River Forwarders for the proper loading, stowage, custody, care, and delivery of the cargo. 46 U.S.C. § 190.

7.

Thus, since water entered the barge and damage occurred after the barge left New Orleans, the provisions of the Harter Act clearly dictate that Riverway Barge Company is liable to River Forwarders for any such negligent damage.

8.

■ Riverway Barge Company asserts that it had no Harter Act responsibilities to River Forwarders because River Forwarders was not "cargo interests" or the actual owner of the cargo. Although River Forwarders was not the owner of the cargo in question, as to Riverway Barge Company, River Forwarders was the "customer" and shipper of the goods. Section 190 of the Harter Act states specifically that its provisions apply to "*any* bill of lading or shipping document" issued by carriers such as Riverway Barge Company, and makes no distinctions between customer, shipper, or actual owner of the cargo.

9.

■ Riverway Barge Company also asserts that § 190 of the Harter Act, which imposes liability on a carrier for damage arising from negligent care of the cargo entrusted to it, does not apply because the terms of the Riverway Barge Company bill of lading places the responsibility for loading and discharging cargo on River Forwarders, not on the carrier, Riverway Barge Company. However, it is the carrier that has the non-delegable duty of properly and carefully loading, handling, stowing, carrying, keeping, caring for, and discharging the goods carried. *Agrico Chemical Co. v. SS Atlantic Forest,* 459 F.Supp. 638, 647 (E.D.La.1978), *aff'd,* 620 F.2d 487 (5th Cir. 1978).

10.

Therefore, any of the provisions in the Riverway Barge Company bill of lading

which attempts to exculpate Riverway Barge Company for negligence, fault, or failure in proper loading, stowage, custody, care or delivery of the cargo in question is void and of no effect. 46 U.S.C. § 190; *F. J. Walker Ltd. v. M/V LEMONCORE,* 561 F.2d 1138 (5th Cir. 1977); *Isthmian Steamship Co. v. California Spray-Chemical Corp.,* 290 F.2d 486 (9th Cir. 1961); *Central Trading Corp. v. M/V DONG MYUNG,* 361 F.Supp. 302 (S.D.N.Y.1973); *Louis Furth, Inc. v. S/S SRBIJA,* 330 F.Supp. 305 (S.D.N.Y.1970); *Levatino Company v. American President Lines, Ltd.,* 233 F.Supp. 697 (S.D.N.Y.1964), *aff'd,* 337 F.2d 729 (2d Cir. 1964).