**UNITED STATES of America,
Petitioner, Appellee,**

v.

**TANKER MONSOON, Respondent,
Appellant.**

**No. 7651.**

United States Court of Appeals,
First Circuit.

Oct. 23, 1970.

**96**

Richard A. Dempsey, Boston, Mass., with whom Leo F. Glynn and Glynn & Dempsey, Boston, Mass., were on brief, for appellant.

Alan S. Rosenthal, Atty., Dept. of Justice, with whom William D. Ruckelshaus, Asst. Atty. Gen., David A. Brock, U. S. Atty., and Alexander P. Humphrey, IV, Atty., Dept. of Justice, were on brief, for appellee.

Before ALDRICH, Chief Judge, McENTEE and COFFIN, Circuit Judges.

ALDRICH, Chief Judge.

The night of April 9–10, 1969 the M/V MONSOON discharged a cargo of No. 6 Bunker oil at the Sprague Terminal, located on the New Hampshire side of the Piscataqua River at Atlantic Point, some two miles above the Portsmouth Navy Yard. In the early morning a complaint was made to the Coast Guard of oil spillage in the river. The officer in charge, a chief boatswain's mate, arrived and, finding the MONSOON the only tanker at any of the several terminals, inspected her. The MONSOON had finished unloading. The chief discovered no traces of oil of any significance around her hull or the pier, and concluded, in view of the absence of such evidence, that for the oil to have come from her it must have been "[w]hen they were all through pumping and they were separating the lines." He decided, in spite of the MONSOON's denial, that since no other vessels had been discharging, and the spillage was No. 6 oil, this is what had happened. In connection with this determination he surveyed the river, and found the oil to extend along the shore four miles upstream, past Dover Point to Fox Point. At Fox Point a substantial quantity had come ashore on the high water, now some time past.

The Coast Guard promptly instructed the U. S. Attorney to libel the MONSOON. The U. S. Attorney thereafter informed her counsel by telephone that in order to sail he would have to post a $10,000 bond to cover various charges in connection with a violation of the Oil Pollution Act, 33 U.S.C., § 431–37, and in addition must make arrangements for

"yourself or us" to clean up the spillage.[1] Upon confirmation that the bond had been written and the MONSOON had arranged to do the clean-up at her expense, she was allowed to sail. A concern hired on her behalf thereafter did the cleaning work, and she filed a cross-claim to the libel to recover from the government the cost thereof.

At the trial the evidence showed conclusively, as a result of a chemical analysis, that although the oil spillage was No. 6 oil, it was special Navy oil—an irony which was not pursued—and not the commercial grade carried by the MONSOON. The government's case accordingly failed, and the sole question was the right of the MONSOON to recover on its counterclaim. The district court held that it could not, finding that the Coast Guard was not negligent in charging the MONSOON, and that there was governmental immunity. This appeal followed.

As to the first point, we find that the immediate, objective evidence, quite apart from the chemical analysis, which was not made until later, points conclusively to what we can only regard as gross negligence on the part of the Coast Guard. Dover Point, a recorded tide station, is three miles upstream from the Sprague Terminal; Fox Point four miles. The first hoses were disconnected at 6:45 A.M. By reference to the Tide Tables it could be readily learned that at 6:45 high water slack had occurred at the terminal and the tide was already running out. Consequently an oil spill could not have moved upstream any distance whatever, let alone the four miles to Fox Point.[2]

The government describes the chief as "experienced in the investigation of oil spills." Having in mind his necessary knowledge of tides, the single most important matter, in the light of the objective evidence of oil extending four miles upstream, was the time of the MONSOON's disconnecting her lines. In this posture the government says, "There is absolutely nothing in the record to indicate that he was aware the unloading had been completed at 6:45 A.M." The burden is the other way. It is inconceivable that before attaching a vessel a reasonable Coast Guard officer, faced on a falling tide with oil extending four miles upstream, should have taken no steps to inquire when the hoses had been disconnected. This was a readily determinable fact. The ship's log and, we would assume, a shore log, must show it. Witnesses were manifestly available, both on board and ashore. Oil pollution is a serious matter. This does not justify charging the first person in sight, without making rudimentary inquiries.

■ We consider the Coast Guard irrefutably negligent, and that it cannot fairly be said, on all the circumstances

---

1. The uncontradicted testimony of the MONSOON'S counsel was as follows: "I asked him what amount of bond he would require to release it, because, at that time, I was primarily interested in releasing the vessel from the arrest. He told me the full amount of the bond, $10,000. He then asked what we would do about the cleaning. He said, 'Would you prefer to clean it yourself or to have us clean it and bill you?' I said, 'We will under those circumstances, we would clean it without prejudicing the rights,' and he said, 'Well, fine,' because at that time he wouldn't know who to get to clean it, anyway. So that was the extent of the conversation. I told him I would call him back as soon as I found out about the bond and the cleaning."

2. We calculate that the oil spill would have to have taken place at least two hours before 6:45 in order to reach Fox Point, it being clear, as the chief conceded, that the upstream current would not have been flowing at its maximum rate during the last part of the flood. See Table 3 of Tide Tables, Atlantic Coast, Height of Tide at Any Time, and U. S. Coast Pilot, Atlantic Coast, Section 1, p. 165 (1965). We cannot refrain from commenting that if Fox Point was 8–10 miles upriver from Sprague Terminal, as Chief Tetrault testified it was (the chart shows 4) it would have taken twice as long. We find such ignorance on the part of a Coast Guardsman in charge of that river, and responsible for attaching vessels, painful.

known to it or readily ascertainable, to have had probable cause to charge the MONSOON. The district court could have found otherwise only because of a landsman's lack of understanding. of a seaman's ready knowledge of tides and currents, of which an admiralty court must take judicial notice.

■■ With respect to governmental immunity, even though the lawsuit was brought as a result of a negligent appraisal, a negligent lawsuit is not a tort. Correspondingly, there was no express contract by the government to repay the MONSOON's expense if unwarrantably incurred. However, under the Tucker Act, 28 U.S.C. § 1346(a) (2), recovery may be had of penalties wrongfully exacted. Compagnie General Transatlantique v. United States, S.D. N.Y., 1927, 21 F.2d 465, aff'd, 2 Cir., 1928, 26 F.2d 195; cf. Alcoa S.S. Co. v. Perez, 1 Cir., 1970, 424 F.2d 433. The government asserts that the recovery of penalties is a form of quasi contractual relief for money wrongfully received and that in the case at bar there was neither a penalty, nor did the government receive anything.

The demand that the MONSOON pay for the cleaning was made pursuant to 33 U.S.C. § 433 (Supp. V, 1970).[3] The argument that this was not a penalty because, rather than an arbitrary amount, it was exactly measured by the size of the offense, does not impress us. However, from the standpoint of wrongful retention, the government correctly points out that it did not itself receive the money expended by the MONSOON in response to its demand. But though it did not receive the money, it received a benefit. The U. S. Attorney made it clear that unless the vessel undertook the cleaning, the government was going to do so at its own expense and submit a bill. See n. 1, ante. Had the MONSOON adopted this alternative, the bill, as it developed, would have proved to be non-collectible. Thus the government would have ended up having to bear the expense. We think of no reason, particularly where the penalty was demanded without even probable cause, why the government should be any better off because the MONSOON adopted the alternative of paying the charges itself. Indeed, we regard this whole episode a sorry chapter in government relations. Were the MONSOON to fail here, no vessel believing itself not to be at fault would ever again cooperate with the government when charged with oil spillage.

The judgment for the defendant in counterclaim is reversed. The action is remanded to the district court with instructions to enter a judgment for the plaintiff in counterclaim with interest from the date it made the payment.

3. 33 U.S.C. § 433 (Supp. V, 1970).
  (a) Prohibition.
  * * * [I]t is unlawful for any person to discharge or permit the discharge from any boat or vessel of oil by any method, means, or manner into or upon the navigable waters of the United States, and adjoining shorelines of the United States.
  (b) Removal of discharged oil; costs and expenses of removal; penalties for failure to remove.
  Any person discharging or permitting the discharge of oil from any boat or vessel, into or upon the navigable waters of the United States shall remove the same from the navigable waters of the United States, and adjoining shorelines immediately. If such person fails to do so, the Secretary [of the Interior] may remove the oil or may arrange for its removal, and such person shall be liable to the United States, in addition to the penalties prescribed in section 434 of this title, for all costs and expenses reasonably incurred by the Secretary in removing the oil from the navigable waters of the United States and adjoining shorelines of the United States. These costs and expenses shall constitute a lien on such boat or vessel which may be recovered in proceedings by libel in rem.