**NORTHEAST PETROLEUM CORPORATION, Plaintiff,**

v.

**KYRIAKOU SHIPPING COMPANY, LTD., and T/T ATHENIAN STAR, Defendants.**

**Civ. A. No. 75–622–M.**

United States District Court, D. Massachusetts.

June 25, 1979.

Gaston Snow & Ely Bartlett, Andrew F. Lane, Boston, Mass., for plaintiff.

Richard A. Dempsey, Boston, Mass., for defendants.

## OPINION

ALDRICH, Senior Circuit Judge.*

■ This is an action in personam and in rem by a consignee for loss of oil due to storm damage suffered by the carrier while making a winter crossing from Rotterdam to Portsmouth, New Hampshire. The ATHENIAN STAR, owned by defendant Kyriakou Shipping Co., departed Rotterdam on January 20, 1975. She was operated by defendant on a charter party with Ilford Trading and Production Co., a subsidiary of plaintiff, Northeast Petroleum Corporation, and contained a cargo of # 2 oil acquired by plaintiff from Ilford. On January 22, and intermittently thereafter, she encountered strong head winds and high seas, eventually losing a piece of bow plating and suffering other damage. The content of No. 2 port wing tank was lost, the content of No. 1 center tank was jettisoned, and the content of several other tanks was partly lost and partly mixed with sea water, due to loss of their Butterworth plates. There

* Sitting by designation.

was no evidence of navigational or management error. Defendant contends that the losses were due to perils of the sea, viz., exceptional weather, but if due to unseaworthiness, that defendant exercised due diligence in failing to discover defects. Under the Carriage of Goods by Sea Act, 46 U.S.C. § 1304, defendant bears the burden of proof as to these defenses.

The ATHENIAN STAR was a parcel tanker of Cypriot registry, built in 1957, whose normal speed was 13 knots. She was 560 feet long, with a beam of 70 feet, and drew 31 feet on this voyage.[1] Because of rust scale and blisters, or to avoid overloading, the No. 1 port and starboard wing tanks were left empty. The serious dispute concerns the condition of the rest of the vessel and the severity of the weather. The ensuing account, with a single exception, constitutes findings based on the log[2] and the record as a whole. The exception is that the wind forces (Beaufort) are those given in the log and by defendant's witnesses, whose reliability I will assess later.

January 20, 16:30 hours, sea passage commenced. Until January 21, 12:00, rough seas, wind force 6; average speed 11.58 knots. January 22, wind 8, heavy seas breaking on deck; later, wind 10, heavy seas break and wash decks, vessel strongly pitching, hull working excessively and subject to heavy fatigue. On January 23 hawse pipes' cement broken and carried away, permitting water to enter chain locker. This was corrected. At 16:00 hours canvas covering on all forecastle ventilators torn away, and dry cargo hold flooded. Because of weather, this could not be repaired. On January 24 wind diminished to force 9,

but seas did not decrease.[3] On January 25 it was possible to replace canvas covers and pump water out of hold. On January 27, 16:00 hours, entry in log, "Force 9. Same weather condition. Vessel continuously suffering since sailed from Rotterdam without any change." January 29, wind blew force 12 for four hours, and then reverted to 9. On January 30 it was discovered that cement and ventilator canvas had failed again, and chain locker and forward hold were again flooded. Repairs, and chain locker pumped out, but hold pumps' suction was clogged by debris, leaving 700–800 tons of water to remain for rest of voyage, lowering the bow 5 feet. In addition, it was found that several Butterworth plates had become loose, permitting the contents of four tanks to be partially lost and replaced by sea water. Plates were tightened.

On January 31, force 11 winds. Oil appeared to be leaking from No. 2 port wing tank. The Butterworth plates were again loosened, this time carried away by seas, permitting further loss of cargo until weather abated and they could be replaced. On February 4, "weather rapidly deteriorating;" force 10; cargo from No. 1 center tank jettisoned "to common save of crew and her cargo."[4] Thereafter the wind increased to force 12; "mountainous seas break strongly on decks, hull and engine extremely suffering, subjected to very serious stresses and fatigue. Vessel rolling, pitching, pounding excessively strongly . . . . Noted catwalk, Fwd section plating port carried out by seas and extensive damages to piping on decks and to two Fwd mooring winches." On other dates,

1. The captain's deposition that her "freeboard from bow to stern" was 8'10" presumably refers to her load waterline. Belatedly, by reply brief, plaintiff asserts that her winter mark called for 9'. This raises the question of Rotterdam's low salinity, briefly touched on at trial. It raises that question too late—I will assume the captain was speaking of the terminal, where 8'10" was sufficient.

2. The bridge complement was Greek, and both the rough and smooth logs were in that language. Only the latter was translated by the captain. I accept his testimony, and that of the second officer, that he translated it accurately.

I also accept his testimony that its content had his own, contemporaneous sanction.

3. During the whole passage the wind was more or less on the bow. To accommodate wind and sea the course was varied from time to time between 220° and 260°.

4. Prior counsel for plaintiff, taking captain's deposition, disclosed captain's cables to owner to the effect that on January 31 "ship and crew are suffering," and on February 4 (?) "crew in despair."

the piping to the steering gear telemotor system was broken (electric gear substituted), and various deck platforms, supports, cables, davits and ladders were bent, broken, and in some cases carried away. The most unusual feature, however, was the loss of the plating from the hull at the location of the No. 2 port wing tank. On the basis of expert testimony I find this was a brittle fracture occasioned by continuous stress due to pitching and tortional motion of the ship, magnified by the weight of the sea water admitted forward and by the loss of internal stiffeners due to inability of the welds to withstand this stress.

■ Plaintiff's first response to the asserted defenses as to all of these casualties was that defendant had greatly exaggerated the severity of the weather conditions. Plaintiff called one Raguso, an expert whose occupation was to correlate weather reports and advise ships of anticipated conditions, best routes, etc., and also, on demand, to reconstruct past conditions. He testified that the ATHENIAN STAR had encountered only force 8 and 9 winds, and less seas than she reported. He was contradicted by an expert produced by the defendant. Viewed as an abstract matter, I would be more persuaded by Raguso's qualifications and reasoning than by defendant's expert. It is also true that the ship possessed no anemometer, so that the captain's and the second officer's testimony was only a matter of opinion. However, it is a known fact that weather is not necessarily consistent, particularly when one is concerned with fronts, as was the case here. Plaintiff makes much of the fact that defendant's own expert once questioned the log. All defendant's expert said, however, was that the weather map did not support the entry of force 10 on January 23. This is the day that the ventilator canvas was first carried away, and the average speed was 7.83 knots.[5] In considering weather I am impressed by the damage to equipment, which plaintiff does not dispute, and particularly impressed by the frequent marked reductions in speed. *Cf. J. Gerber & Co. v.*

*S.S. Sabine Howaldt*, 2 Cir., 1971, 437 F.2d 580, 596; *Balfour, Guthrie & Co. v. American-West African Line, Inc.*, 2 Cir., 1943, 136 F.2d 320, 321, *cert. denied*, 320 U.S. 804, 64 S.Ct. 437, 88 L.Ed. 486; *Philippine Sugar Centrals Agency v. Kokusai Kisen Kabushiki Kaisha*, 2 Cir., 1939, 106 F.2d 32, 34. The average speed for the entire passage was 8.14 knots, as against fair weather speed of 13. It is tempting to think that ship's officers, perhaps unconsciously, or even consciously, standing by the ship, and ultimately highly fatigued, would tend to exaggerate the conditions to which they were subjected. But while opinions might be fudged, one would hardly linger in mid-Atlantic in order to make a better case for the underwriters. I doubt force 12 opinions from tired officers, but I conclude that more than once there were winds at least of force 10, sufficient to produce exceptionally heavy seas.

■ This alone, of course, is not the answer. Unless read very narrowly, I could not agree with Judge Learned Hand, speaking for the court in *Philippine Sugar Centrals Agency v. Kokusai Kisen Kabushiki Kaisha*, ante at 34, that a "storm . . . of unusual severity [is an excusable peril of the sea even if] it was no more than was to be expected in those waters at that time . . . [if it was] bad enough to damage the gear and superstructure of a seaworthy ship." Rather, I agree with that court's later statement in *In re Marine Sulphur Queen*, 2 Cir., 1972, 460 F.2d 89, 100, *cert. denied*, 409 U.S. 982, 93 S.Ct. 318, 34 L.Ed.2d 246, "An owner has a duty to provide a vessel that can withstand expectable weather." *See also J. Gerber & Co. v. S.S. Sabine Howaldt*, ante. However, I agree that such damage, as well as the lying to, and the marked reductions in speed, may be confirmatory of excessive weather. Viewing all the evidence, I find that the ATHENIAN STAR encountered sufficient weather to constitute a prima facie peril of the seas excuse. This finding shifts the burden to the cargo owner to show that there was unseaworthiness that contributed to the

---

5. I find that the 1.83 figure on the exhibit is a typing error for 7.83.

loss. *J. Gerber & Co. v. S.S. Sabine How-aldt*, ante. If plaintiff succeeds here, defendant may then defend by showing due diligence.

■ I accept the testimony of plaintiff's ultrasonic expert that in a few instances the hull plate wear (rust deterioration) was somewhat beyond the customary 25–30% allowance. There was no credible testimony, however, that this was general or substantial. There was also evidence that the stiffeners were thin, and in some cases somewhat bent. I accept the testimony of defendant's insurance surveyor, however, that they were not beyond limits. I do not find that the shallow dent in the hull, of which much is made by counsel, impaired seaworthiness. While I credit the testimony of the Coast Guard officer who inspected the hull after unloading at Portsmouth insofar as it related to objective facts of cracks, detached stiffeners, etc., I do not find him qualified to state when or why this damage occurred. He was neither a naval architect nor a metallurgist.[6] Defendant's well-qualified expert faulted him in a number of important respects, and I accept that view.

The bow plating failed due to a combination of heavy weather and the weight of the water admitted through the ventilators. The bow of a ship running into heavy, boarding seas is subjected alternatively to raising and lowering forces which are transmitted to the whole vessel. If the bow contains an extra weight, the strain is increased, as anyone who has the choice of shovelling wet or dry snow could testify. Defendant's naval architect credibly testified that the water in the hold doubled the shear stress on the hull plating, notably where it cracked open.

■ Defendant is not liable, however, for the introduction of the water into the cargo hold. There was no evidence that the ventilator covers were defective. A sea which will tear off all five covers must have been an exceptional one, and I am not persuaded otherwise by the expert testimony that the officers' account was exaggerated. In this posture plaintiff asserts that the existence of debris in the hold sufficient to clog the pumps and prevent the water's removal was itself an unseaworthy condition. Bypassing the question whether the brittle crack was initiated before it was possible to repair the ventilator covers and attempt to pump, had the clogging occurred the first time around there might have been something to this. The debris accumulated, however, only because of an unexpected prior total flooding. Accordingly, I find no liability for the loss of the content of No. 2 port wing tank. Equally, because of the weather and this alien weight in the dry cargo hold, jettisoning the content of No. 1 center tank was necessary and proper, and subject to General Average, as is now proceeding. I do not, however, absolve defendant for loss of the Butterworth plates.

If, at the end of a voyage, a tank needs to be cleaned, this is effected by a Butterworth machine admitted through a hole in the deck. The original device provided a three-toggled plate to cover the hole when not in use, but this had become outmoded. In August, 1974, the ATHENIAN STAR was inspected by an insurance surveyor, who reported,

"We also noted that quite some butterworth holes in the weather deck were still covered/closed with old patent covers fitted with 3 toggles each. Other butterworth holes were already closed with

6. Although it does not reflect negatively on the witness, no special expertise attaches because of his position in the Coast Guard. The court's experience with the Coast Guard has not been such to inspire confidence. *Cf. United States v. Sandra & Dennis Fishing Corp.*, 1 Cir., 1967, 372 F.2d 189, *cert. denied*, 389 U.S. 836, 88 S.Ct. 48, 19 L.Ed.2d 98. (Lt. (jg.) in charge of cutter mistook light eleven miles away for flashing buoy signalling turn; many defects of equipment and management; five men drowned); *United States v. Tanker Monsoon*, 1 Cir., 1970, 433 F.2d 95 (in charging alleged source of oil spill in tidal river, Coast Guard neglected to note that tide was flooding instead of ebbing); *Burgess v. M/V Tamano*, 1 Cir., 1977, 564 F.2d 964, *cert. denied*, 435 U.S. 941, 98 S.Ct. 1520, 55 L.Ed.2d 537 (buoy tender, on annual round, determined two channel buoys out of position and moved them, leaving them 130 feet and 175 feet, respectively, off station; cross-bearings in logbook incomprehensible).

steel plate covers bolted down by means of bolts and nuts."

On the stand the surveyor testified, as must be obvious, that a plate with three toggles more readily works loose than one with more fastenings, increasing the danger of losing cargo and admitting sea water contaminating the balance. The surveyor's report was plainly a criticism, as was made clear when he made a further inspection in November and added to his report,

"Several Butterworth holes were still provided with old patent covers."

Defendant made no further changes. Precisely what could have been expected to happen happened on January 30, when the plates loosened and oil escaped and was replaced by sea water. Although the plates were tightened, the following day they came off altogether, with doubtless a more substantial loss. Defendant contends that this was all excusable because of the exceptional weather. I reject this conclusion for a number of reasons.

▮ In the first place, although these were unusual seas, storms are a matter of degree and, strictly, there is no limit to what at least is possible. *See Commonwealth of Massachusetts v. Andrus,* 1 Cir., 1979, 594 F.2d 872, 876. In measuring the duty of shipowners to protect cargo, it is appropriate to consider the relative costs[7] and the seriousness of the possible loss as well as the likelihood of an occurrence. *See* discussion in *United States v. Carroll Towing Co., Inc.,* 2 Cir., 1947, 159 F.2d 169, at 173; *Cf. Back v. Wickes Corp.* (Mass.1978) 378 N.E.2d 964, 970; Restatement of the Law (2d), Torts, §§ 291–93. The cost of replacing the balance of the Butterworth plates was insignificant, and the possible damage substantial. Even if it be thought that an untoward occurrence was quite unlikely, this is a typical situation, as, indeed, the surveyor's report suggested, where the shipowner was reasonably required to take a small step which would reduce the risk of a large loss. I find the vessel unseaworthy with respect to the Butterworth plates.

▮ Correspondingly, defendant was lacking in diligence. Two warnings were enough. Even though the insurer did not press the complaint, due diligence is not limited to diligence in obtaining a certificate. *See S.S. Amazonia v. New Jersey Export Marine Carpenters Inc.,* 2 Cir., 1977, 564 F.2d 5, 9. Nor am I impressed by the argument that only loosening might have been anticipated, and that the complete loss of the plates, with doubtless greater cargo damage, was due to extraordinary circumstances, viz., wrenching due to the weight of the sea water in the hold, and thus beyond the range of expectation. In the first place, defendant having been negligent towards the cargo, the unexpectedness of the extent of the injury is normally no defense, and should not be here. *Gallick v. Baltimore & Ohio R.R. Co.,* 1963, 372 U.S. 108, 120–21, 83 S.Ct. 659, 9 L.Ed.2d 618; *Petition of Kinsman Transit Co.,* 2 Cir., 1964, 338 F.2d 708, 722 *et seq.* But even if it were, I find that the possibility of some loss should have been anticipated, in the ordinary course, by heavy seas loosening the plates. The burden was on defendant to separate out damage for which it was not responsible, *Schnell v. The Vallescura,* 1934, 293 U.S. 296, 306–07, 55 S.Ct. 194, 79 L.Ed. 373, a burden in no way met.

The loss of oil from these four tanks was 10,367 barrels, worth $11.63 a barrel. The cost of decontaminating the remaining oil and other incidental expenses totalled $23,074. Damages are assessed at $143,643, with interest at 8% from February 10, 1975.

No costs.

▮

---

7. Cost may be measured in inconvenience as well as money. *Cf. Stanley v. United States,* 1 Cir., 1973, 476 F.2d 606, 608.